UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION


**WILLIAM C. ROLL, as Trustee**
**for the HOPE C. ROLL TRUST**
**and HOPE C. ROLL, as Trustee for**
**the WILLIAM C. ROLL TRUST,**

     Plaintiffs,

-vs-              CASE NO:   6:05-CV-1263-ORL-28-JGG

**XETHANOL CORPORATION f/k/a,**
**ZEN POTTERY EQUIPMENT, INC.**

     Defendants.

_____/

*Certified Copy*


THE VIDEOTAPE DEPOSITION OF:

WILLIAM C. ROLL

Taken by the Defendant


DATE:             Monday, September 18, 2006

TIME:             1:38 p.m. - 5:10 p.m.

LOCATION:       Baker & Hostetler, LLP
                       200 South Orange Avenue
                       Orlando, Florida  32801

REPORTER:       Pamela S. Hardy, FPR, RMR, CRR




**MJC REPORTING, INC.**

1314 E. Robinson Street
Orlando, Florida 32801
407.894.7545
800.393.7545
Fax 407.894.5042

www.mjcreporting.com

```
 1      A P P E A R A N C E S:

 2

 3                    W. MARVIN HARDY, III, ESQ., OF:
                      Shuffield Lowman & Wilson, P.A.
 4                    Gateway Center
                      1000 Legion Place, Suite 1700
 5                    Orlando, Florida  32801
                      (407)581-9800
 6                    on behalf of the Plaintiffs

 7

 8                    JERRY R. LINSCOTT, ESQ., OF:
                      Baker & Hostetler, LLP
 9                    200 South Orange Avenue
                      SunBank Center, Suite 2300
10                    Orlando, Florida 32801
                      (407)649-4000
11                    on behalf of the Defendants

12      VIDEOGRAPHER:  Ricky Dyer
                       Baker & Hostetler, LLP
13

14              *      *      *      *      *

15

16

17

18

19

20

21

22

23

24

25
```

1                            I N D E X

2
         Monday, September 18, 2006
3

4        TESTIMONY OF:   **WILLIAM C. ROLL**

5            Direct Examination by **Mr. Linscott**        5
             Cross Examination (None)
6
         ERRATA                                           125
7        CERTIFICATE OF OATH                              126
         CERTIFICATE OF REPORTER                          127
8

9
                          *  *  *  *  *
10
                     DEFENDANT'S EXHIBITS
11
         Exhibit No. 30
12         Check register                                  99

13       Exhibit No. 31
           Three deposit receipt                          123
14

15
         FORMER EXHIBITS IDENTIFIED:
16
         Defendant's Exhibit 4                            75
17       Defendant's Exhibit 5                            76
         Defendant's Exhibit 11                           83
18       Defendant's Exhibit 24                           84
         Defendant's Exhibit 21                           92
19       Defendant's Exhibit 6                            96
         Defendant's Exhibit 29                           107
20

21                   *     *     *     *     *

22

23

24

25


                     MJC REPORTING, INC.

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | THE VIDEOGRAPHER:  We're on the record. |
| 3 | Today's date is the 18th of September, 2006. |
| 4 | Time now is 1:38 p.m.  We're here to take |
| 5 | the deposition of William C. Roll taken by |
| 6 | defendants at the offices of Baker & |
| 7 | Hostetler, LLP, 200 South Orange Avenue, |
| 8 | Suite 2300, Orlando, Florida, 32801.  In the |
| 9 | matter of William C. Roll as trustee for the |
| 10 | Hope C. Roll Trust and Hope C. Roll as |
| 11 | trustee for William C. Roll versus Xethanol |
| 12 | Corporation, f/k/a Zen Pottery Equipment, |
| 13 | Inc. |
| 14 | In the United States District Court, |
| 15 | Middle District of Florida, Orlando |
| 16 | Division.  Case number 6:05-CV-1263-ORL-28-JGG. |
| 17 | My name is Ricky Dyer.  I'm a certified |
| 18 | legal video specialist with Baker & |
| 19 | Hostetler, offices Orlando, Florida, 32801. |
| 20 | And the court reporter is Pam Hardy of MJC |
| 21 | Reporting, Inc. 1314 East Robinson, Orlando, |
| 22 | Florida 32801. |
| 23 | Will counsel please introduce |
| 24 | themselves? |
| 25 | MR. HARDY:  Good afternoon.  My name is |

|     |     |
| --- | --- |
| 1 | Marvin Hardy.  I represent the plaintiffs. |
| 2 | MR. LINSCOTT:  Jerry Linscott with the |
| 3 | Orlando office of Baker & Hostetler on |
| 4 | behalf of the defendants Xethanol |
| 5 | Corporation. |
| 6 | THE VIDEOGRAPHER:  Would the court |
| 7 | reporter please swear in the witness? |
| 8 | WHEREUPON: |
| 9 | **WILLIAM C. ROLL** |
| 10 | **having been first duly sworn to tell the truth, the** |
| 11 | **whole truth and nothing but the truth, testified as** |
| 12 | **follows:** |
| 13 | THE WITNESS:  I will. |
| 14 | **DIRECT EXAMINATION** |
| 15 | BY MR. LINSCOTT: |
| 16 | Q.    Will you state your full name, please? |
| 17 | A.    William Carl Roll. |
| 18 | Q.    Where do you live? |
| 19 | A.    1194 North Park Avenue Winter Park, Florida, |
| 20 | 32789. |
| 21 | Q.    Are you gainfully employed? |
| 22 | A.    Yes. |
| 23 | Q.    And what do you do? |
| 24 | A.    Real estate development. |
| 25 | Q.    Do you do that in your individual name or |

00:01 (line 5)
00:01 (line 15)
00:01 (line 20)

1      under a business entity?

2              A.   Business entity.

3              Q.   And what is the name of that entity?

4              A.   I have currently there are two operating.

00:01   5      One is called Indiana Place, LLC --

6              Q.   Go ahead, sir.

7              A.   Indiana Place, LLC, and there's another one

8      called Orwin Villas, LLC.  And then we still have

9      TREP.  That has not been closed out yet.

00:02   10             Q.   What is the nature of the development

11      activity engaged in by Indiana Place, LLC?  Is it

12      Indiana or Indian?

13             A.   Indiana.

14             Q.   What does it do?

00:02   15             A.   It's a townhouse development, very similar

16      to the Harper Place project, smaller in scope, six

17      townhouse units located on Indiana Place, excuse me,

18      located on Indiana Avenue in Winter Park.

19             Q.   And the other one, Orwin Villas, what is

00:03   20      that?

21             A.   Orwin Villas is a piece of property that is

22      directly adjacent to the Harper Place project that we

23      did under TREP.  It is, has a small piece on 17-92 and

24      it is going to be a mixed use type of a project,

00:03   25      current zoning is C2 and O2.  It is also within the

MJC REPORTING, INC.

1     city of Winter Park.

2          Q.   Are you the managing member of both Indiana

3     Place and Orwin Villas?

4          A.   I am the managing member of Indiana Place.

00:03   5     I am the comanaging member in Orwin Villas.

6          Q.   Who is the comanaging partner at Orwin --

7     managing member at Orwin Villas?

8          A.   Doug Trovillion.

9          Q.   Where did you grow up?  What's your

00:03   10    hometown?

11         A.   I grew up in northern Virginia in Fairfax

12    County.

13         Q.   And did you attend an institution of higher

14    learning after high school?

00:04   15         A.   Yes, I did.

16         Q.   And where did you go?

17         A.   North Carolina State University in Raleigh.

18         Q.   Did you achieve a degree at that

19    institution?

00:04   20         A.   Yes.

21         Q.   In what?

22         A.   Civil engineering, construction option.

23         Q.   And what have you generally done for gainful

24    occupation since that date?

25         A.   Mostly construction and development work.

MJC REPORTING, INC.

1        Q.    When is it that you received your degree

2    from North Carolina State?

3        A.    1983.

4        Q.    And where did you first exercise your

5    construction activities?  What geographic area?

6        A.    I moved back to the Washington D.C. area and

7    went to work for a company called Miller & Long

8    Concrete Construction.

9        Q.    How long were you engaged in employment with

10    Miller & Long?

11        A.    I worked there two years.

12        Q.    In what capacity?

13        A.    I was a project estimator and project

14    administrator.

15        Q.    What did you next do?

16        A.    I then moved to a -- worked for a general

17    contracting company that Miller & Long worked for

18    quite a bit called Donahoe Construction.  They were

19    located on Wisconsin Avenue in Washington D.C.

20        Q.    What was the nature of the activity engaged

21    in by Donahoe?

22        A.    Commercial work, mostly high-rise stuff

23    downtown, throughout the downtown surrounding area.

24        Q.    And how were you employed by them?  In what

25    capacity?

1          A.    I was an assistant project manager, I
2     believe, at my highest level.

3          Q.    What periods of time were you employed by
4     Donahoe?

00:05    5          A.    I worked for Donahoe from 1985 to '87.

6          Q.    What was your next gainful employment?

7          A.    Then I moved to a development company that
8     was developing around the Dulles airport area in
9     Sterling, Virginia.  That company name was Landstar
00:06   10    Development.

11         Q.    What was the nature of your position with
12    Landstar?

13         A.    I was in charge of the construction part of
14    the development company.  The owner of that company
00:06   15    had three different divisions.  One was general
16    contracting, one was a concrete tilt-up business, and
17    one was a development company, and I worked in the
18    development arm of it.

19         Q.    Doing what?

00:06   20         A.    As the construction manager.

21         Q.    Of infrastructure or the actual buildings?

22         A.    I was in charge of both.  My duties were to
23    coordinate with his other construction company who
24    then in turn coordinated with the tilt-up division.
.6      25    My job was to be the liaison between tenants and the

MJC REPORTING, INC.

1    contractor.

2         Q.   And how long did you work for Landstar?

3         A.   I worked there two years.

4         Q.   That was from '87 to '89?

00:07    5    A.   '87 until '89.

6         Q.   Where did you next go?

7         A.   Then we -- I had met my wife Hope in the

8    meantime and we relocated here to Central Florida.

9         Q.   Was that in 1990?

00:07    10   A.   Correct.

11        Q.   And what was the nature of the gainful

12   occupation you engaged in when you came to Florida?

13        A.   I started out by helping her brother do some

14   construction work around town, got my own license as a

00:07    15   general contractor, and then started doing general

16   contracting work on my own.

17        Q.   And which one of the brothers did you work

18   with when you first came down?

19        A.   Charlie.

00:07    20   Q.   That would be Charles, the Third?

21        A.   Correct.

22        Q.   And when did you get your own construction

23   license?

24        A.   I believe I got it in 1990.  I'm not 100

00:08    25   percent sure on that date.

1    Q.    And when did you start building or
2    developing in your own right?
3    A.    Probably fairly quickly after I got it, my
4    license.
00:08    5    Q.    And tell me about your development
6    activities in Florida since that time up until 2002
7    when I think I know what you've done after that, but
8    from 1990 to 2002, tell me what you -- what projects
9    you worked on and who did you work for?
00:08    10    A.    I started doing some small residential
11    remodeling.  I ended up doing the -- running into and
12    doing the remodel of the franchise, one of the major
13    franchisees in the area of Subway sandwich shops, and
14    that led me to, into remodel of a lot of his stores
00:09    15    around the Central Florida area.  I then started doing
16    just mostly small commercial work.  I've done some
17    churches and some add-ons and some metal building
18    stuff and some tenant finishes.
19    Q.    What was the name of the entity you used for
00:09    20    this construction activity in the '90s?
21    A.    It was called W.C. Roll Construction.  At
22    some point I also started a company that was going to
23    be a, that was a concrete subcontracting company and
24    that was called R & W Concrete.  That was an inc.
00:09    25    Q.    The W.C. Roll Construction, was that an inc.

1    or an LLC?

2           A.    That was an inc.

3           Q.    Who were the shareholder or holders of W.C.

4    Roll?

00:10    5           A.    I think I was.

6           Q.    How about R & W Concrete?  Who were the

7    shareholders of that entity?

8           A.    I was one and I had a partner named

9    Roosevelt Williams who was another.

00:10    10           Q.    Was he the W of R & W?

11           A.    Yes, he was.

12           Q.    Is W.C. Roll Construction, Inc. still in

13    business?

14           A.    No.

00:10    15           Q.    When did it cease business?

16           A.    I think we filed our final tax return last

17    year.

18           Q.    When did it actually stop doing any work?

19           A.    It was finishing up doing any work in 2001-

00:10    20    2002.

21           Q.    By 2002 had W.C. Roll done, finished its

22    last construction project other than perhaps punch

23    list items or warranty items?

24           A.    I believe so.

25           Q.    And when in 2002 had it reached that level?

1    A.   I'm not 100 percent sure.

2    Q.   Early, late, or you don't know?

3    A.   Probably right in the middle.

4    Q.   Is R & W Concrete still in business?

00:11   5    A.   No, it's not.

6    Q.   And when did it cease business?

7    A.   Probably in 2000.

8    Q.   And after W.C. Roll Construction stopped its

9    physical development activity, construction activity

00:11   10   in the middle part of 2002, what did you next do?

11   A.   By that time I was working with John Murphy

12   on Very Smart Networks.

13   Q.   Had you also started working with Mr. Murphy

14   on the TREP project in 2001?

00:12   15   A.   TREP project at Harper Place, we were

16   probably under contract and drawing drawings to begin

17   construction.  I'm not sure exactly when we broke

18   ground on that.

19   Q.   Do you know whether you broke ground on the

00:12   20   Harper Place project in 2001 or 2002?

21   A.   I think it was 2002.

22   Q.   Do you recall what period of time in 2002

23   that began?

24   A.   No.  I can look it up.  I'm not 100 percent

25   sure.

1      Q.    Had W.C. Roll Construction, Inc. wound down

2    its construction activities before TREP began the

3    construction of the Harper Place project?

4      A.    There may have been some overlap.  I'm not

00:12  5    100 percent sure.

6      Q.    If there was overlap, was it much of an

7    overlap?

8      A.    No.  And W.C. Roll as it wound down only had

9    one project.  I was building a small church out in --

00:13  10    called Banana Bay Baptist, and it was a fairly simple

11    building that was winding down.

12      Q.    Tell me how you got involved with the TREP

13    Harper Place project.

14      A.    Well, I had been working with Mr. Murphy on,

00:13  15    at Very Smart Networks.  I had traveled with him to

16    Jacksonville to see a big townhouse project that he

17    had going on, or excuse me, an apartment project that

18    he had going on called St. Johns Estates, and I think

19    he had started Casa Cielo in either late '01 or early

00:13  20    '02.  I happened to also sit at that time on the

21    planning and zoning of the City of Winter Park and had

22    seen Mr. Harper and his sister bring this project

23    through and mentioned it to John Murphy one day and we

24    rode by and the Harpers happened to be standing on the

25    corner.  So we got out and introduced ourselves.

|       | 1  | Found out that there was an existing contract on the |
|-------|----|---|
|       | 2  | property.  Bob Harper kind of indicated to us that he |
|       | 3  | would take a backup contract because he didn't have |
|       | 4  | any faith in whoever was contracting for it, and we |
| 00:14 | 5  | did that.  And so that's how that project got started. |
|       | 6  | Q.    At the time that you and Mr. Murphy went by |
|       | 7  | what became the Harper Place project and saw |
|       | 8  | Mr. Harper standing out on the corner, had the company |
|       | 9  | TREP yet been formed? |
| 00:14 | 10 | A.    No, I don't believe so. |
|       | 11 | Q.    How long after you and Mr. Murphy met |
|       | 12 | Mr. Harper on the corner did you give a backup |
|       | 13 | contract on that property? |
|       | 14 | A.    Oh, I would have thought that we probably |
| 00:15 | 15 | tried to react fairly quickly. |
|       | 16 | Q.    Within a week or ten days? |
|       | 17 | A.    Week or two, yes.  We were directed to |
|       | 18 | contact his realtor which was Mr. Vince Arch and |
|       | 19 | that's what we did. |
| 00:15 | 20 | Q.    Who amongst you contacted Mr. Arch? |
|       | 21 | Yourself or Mr. Murphy? |
|       | 22 | A.    I don't remember who it would have been. |
|       | 23 | Q.    When a backup contract was given to |
|       | 24 | Mr. Harper on the Harper family property, in what name |
|       | 25 | was it given? |

MJC REPORTING, INC.

1          A.    Well, in going through the files just

2     recently, it looks like it was done under Mr. Murphy's

3     father at first, and I don't remember that happening,

4     but I see it in the file.  And I can only say that

00:15     5     perhaps it was done because we had not formed TREP

6     yet.

7          Q.    Are you saying that you didn't know it was

8     Mr. Murphy's father at the time who gave the contract

9     or you had not remembered when you saw recently --

00:16    10          A.    I had not remembered it.

11          Q.    And did the first contract that the Harpers

12     had on the property fall out of time?

13          A.    Yes, it did.

14          Q.    And were you then notified by Mr. Harper

00:16    15     that your contract would be accepted?

16          A.    Yes.

17          Q.    What did you and/or Mr. Murphy do thereafter

18     with respect to the TREP project?

19          A.    Well, we ultimately got the project to

00:16    20     close.  I believe it did take some time to get to

21     closing, and I'm not sure exactly why.  It could have

22     been us getting financing and forming Technology Real

23     Estate Partners, et cetera.  But once we actively

24     started talking to banks about financing, and then

⌐  .6    25     moving towards closing.

1      Q.    How long did that process take?  You say it
2    took longer than you anticipated.  But how long was
3    it?

4      A.    I think it probably took us about six months
5    or more.  And I say that because I do know that at
6    some point we were required per the contract to send
7    the Harpers extension interest monies, which we did,
8    and that happened more than once and maybe as many as
9    three or four times.

10     Q.    What role did you play in the formation of
11   TREP and the obtaining of financing for that project?

12     A.    I -- we relied on Mr. Infantino as our
13   attorney at that time, so I'm sure that he formulated
14   it.  I was more involved with the actual drawings and
15   construction.  Mr. Murphy handled putting together
16   packages for banks and so on and so forth.

17     Q.    Prior to the time that you and Mr. Murphy
18   drove by and saw Mr. Harper on the corner, do I
19   understand correctly that you and Mr. Murphy were both
20   working at Very Smart Networks, Inc.?

21     A.    Yes.  I believe so.

22     Q.    And when had you started working at Very
23   Smart Networks?

24     A.    I moved into the office there on Knowles
25   Avenue in Infantino's office in the summer of '01, I

1    believe.

2         Q.    You heard your wife testify at her

3    deposition today that she first met Mrs. Murphy at the

4    beginning of the school year, near the beginning of

00:18    5    the school year 2000 and at least by April of 2001 you

6    and the Murphys had traveled together over at Vero

7    Beach.  Do you concur in that time frame?

8         A.    I think that's about -- I'm not sure when we

9    really traveled to Vero Beach, but we did go there

00:18   10    with them.

11         Q.    You wouldn't have any reason to disagree

12    with what your wife testified about; is that correct?

13         A.    That is correct.

14         Q.    At the time you went to Vero Beach with the

00:19   15    Murphys, were you yet working at Very Smart Networks

16    at that time?

17         A.    I would not recall the timing exactly on

18    that.

19         Q.    Tell me as best you can recall how you came

00:19   20    to work for Very Smart Networks.  How did that come

21    about?

22         A.    I started traveling to St. Johns County up

23    near Jacksonville with John and John's father when he

24    would do trips up there.  I guess I went up there

00:19   25    three or four times.  He was working with a fellow up

1       there named Donnie Lamey, or Lamey, and had Jack Duval

2       up there.  They were -- he was completing what's

3       called the St. John Estates apartment complex.  In the

4       apartment complex he had set up a room that had the

00:20   5       ability to handle the phone services for all of the

6       apartments and the cable services for all of the

7       apartments, and they wanted to do the security and any

8       of the low voltage type uses.  And so I went up there

9       a couple times to see that, see how -- see how the

00:20   10      apartments were finishing out.

11      And we would also go visit Mr. Lamey who was

12      basically the backbone and the expert in this low

13      voltage type of a situation.  He also had -- Donnie

14      Lamey had also set up -- he had leased an office area

00:20   15      and turned it into an executive suite that he sold,

16      where he sold memberships like a club and where a

17      traveling salesperson could use points, come in, plug

18      into the wall, get their Internet conductivity done,

19      either on the couch or in a thing, and that was that

00:21   20      we ended up later wanting to put in as part of the

21      Harper Place project was one of these executive

22      suite-type situations.

23      Q.   What was your reason for having traveled up

24      to St. Johns County with Mr. Murphy during that time

.1      25      frame in connection with his finish out of that

1     apartment complex up there?

2          A.    I was learning, looking into the Very Smart

3     Networks concept, the business plan.  I was

4     essentially trying to wind down being a contractor.  I

00:21    5     wanted to move into something a little bit different.

6     I wanted to learn more about development and so that

7     was basically it.  I was ready to kind of make a small

8     change, a redirection in what I was currently doing.

9          Q.    How was it that you went along on those

00:21   10     trips with Mr. Murphy?  Did he invite you or did you

11     ask to go along?

12          A.    I believe he invited me.

13          Q.    At the point in time when you started

14     traveling with Mr. Murphy up to St. Johns County, had

00:22   15     there already been discussions between you and

16     Mr. Murphy about a potential business plan of

17     capitalizing on this low voltage idea?

18          A.    I would not recall that directly.

19          Q.    So as far as you know when you started going

00:22   20     up to St. Johns, the Very Smart Networks concept had

21     not yet come into fruition; is that a fair statement?

22          A.    Not really.  I think in John's mind that

23     Very Smart Networks concept had been well thought out.

24          Q.    They mentioned it to you before you started

25     traveling up there?

1        A.    Perhaps.  I'm not sure.

2        Q.    If he did you don't recall it sitting here

3    today?

4        A.    I don't know.  Yes.

00:22    5        Q.    Is it fair to say that your going along on

6    those trips was primarily to permit you to become more

7    experienced in the development arena?

8        A.    Yes.  And to become more acclimated in that

9    total concept.

00:23    10       Q.    The Very Smart Networks concept?

11       A.    Of being a service provider.

12       Q.    A service provider for the low voltage

13    concept?

14       A.    Yes.  And the plan ultimately was to be a

00:23    15    provider.  Being a provider means being like a

16    Brighthouse, like a Sprint and like a security

17    company, and in the concept was that you had a captive

18    audience of, you know, 250 to 300 apartment renters

19    who all needed the service, plus the computer Internet

00:23    20    connections.  So it's really four things that you

21    could bill them for if they signed up for it.  And

22    that's what one of the major things that Very Smart

23    Networks was setting out to try to do.

24       Q.    We've gotten ahead of ourselves.

25       A.    Okay.

```
              1         Q.    At the time you were going up to St. Johns
              2    County with Mr. Murphy, although you've indicated he
              3    may have had the concept in mind, Very Smart Networks
              4    hadn't been formed and as best as you can recall
00:24         5    sitting here today he hadn't discussed that concept
              6    with you; fair statement?
              7         MR. HARDY:   Object to the form.
              8         A.    Well, maybe you misunderstood what I was
              9    saying.  He had an actual room that was operating up
00:24        10    there with some of this equipment in it.
             11         Q.    For the apartment project that he had
             12    underway in St. Johns County?
             13         A.    Yes.
             14         Q.    But had he discussed with you the idea of
00:24        15    creating that concept to sell to others not in
             16    connection with apartment complexes he was building?
             17         A.    Yes.  Probably.
             18         Q.    And that was where we had a point of
             19    departure before.
00:25        20         A.    Sorry.
             21         Q.    Had he discussed that concept with you
             22    before you started traveling to St. Johns County with
             23    him?
             24         A.    I don't recall exactly, but I would assume
     5       25    so.
```

MJC REPORTING, INC.

1    Q.    And this traveling to St. Johns County, was

2    it in the year 2000, 2001, 2002?

3    A.    I might have gone up there in late 2000,

4    definitely in 2001.

00:25    5    Q.    And you earlier made reference to setting up

6    an office at Mr. Infantino's offices in Winter Park

7    that was the beginnings of Very Smart Networks.  Am I

8    reading your testimony correctly?

9    A.    Maybe not.

10    Q.    Okay.

11    A.    And I think that prior to me ever coming

12    along, that Very Smart Networks may have been already

13    formed.  I'm not 100 percent sure.

14    Q.    You just don't know?

00:25    15    A.    It wasn't formed because I got there.  Put

16    it that way.

17    Q.    But you don't know whether it had been

18    formed or not prior to the time you became associated

19    with it; is that correct?

00:26    20    A.    I don't know, but I believe it to have been.

21    Q.    But you don't know?

22    A.    Correct.

23    Q.    Thank you.  How did it come about that you

24    and Mr. Murphy at the same time undertook offices at

00:26    25    the Infantino and Berman law firm?

|        |    |    |                                              |
|--------|----|----|----------------------------------------------|
|        | 1  | A. | How is it at the same -- I'm sorry.          |
|        | 2  | Q. | Let me start again.  Did you and Mr. Murphy  |
|        | 3  |    | move into the Infantino and Berman offices at the same |
|        | 4  |    | time?                                        |
| 00:26  | 5  | A. | I believe he was already there when I got    |
|        | 6  |    | there.                                       |
|        | 7  | Q. | How did it come about that you set up an     |
|        | 8  |    | office at that law firm?                     |
|        | 9  | A. | At their invitation or request of           |
| 00:26  | 10 |    | Mr. Murphy.                                  |
|        | 11 | Q. | Okay.  Had you visited him at an office at   |
|        | 12 |    | the Infantino and Berman law firm before you set up |
|        | 13 |    | offices there?                              |
|        | 14 | A. | I don't recall.                              |
| 00:27  | 15 | Q. | And what did Mr. Murphy say to you when he   |
|        | 16 |    | invited you to set up an office at Infantino and |
|        | 17 |    | Berman?                                      |
|        | 18 | A. | What did he -- I don't understand -- I       |
|        | 19 |    | wouldn't recall the exact --                 |
| 00:27  | 20 | Q. | What were you going to do there?             |
|        | 21 | A. | Oh, I was going to help work with Very Smart |
|        | 22 |    | Networks.                                    |
|        | 23 | Q. | And how did you know that?                   |
|        | 24 | A. | We had discussed it.                         |
| 00:27  | 25 | Q. | And when did you discuss it?                 |

| | |
|---|---|
| 1 | A.   Prior to. |
| 2 | Q.   You moving in there? |
| 3 | A.   Yes. |
| 4 | Q.   And what did you discuss?  What were you |
| 5 | going to do for Very Smart Networks? |
| 6 | A.   Oh, I was going to work with the builders |
| 7 | and try to get the wiring technicians together, so on |
| 8 | and so forth. |
| 9 | Q.   And you knew at that point in time that Very |
| 10 | Smart Networks was a start-up company, correct? |
| 11 | A.   Yes. |
| 12 | Q.   So far as you knew it had no customers? |
| 13 | A.   It did have customers up at St. Johns |
| 14 | Estates. |
| 15 | Q.   So it already was the service company for |
| 16 | St. Johns Estates, correct? |
| 17 | A.   Yes. |
| 18 | Q.   Did you know who the principal equity owners |
| 19 | of it were at the time you came in? |
| 20 | A.   No. |
| 21 | Q.   Did you know whether or not Mr. Murphy was a |
| 22 | principal owner of it at the time? |
| 23 | A.   He was. |
| 24 | Q.   And how did you know that? |
| 25 | A.   He was the -- I think he was CEO. |

00:27
00:27
00:28
00:28
00:28

MJC REPORTING, INC.

1          Q.    That's an officer position.  How did you

2     know that he was a principal equity owner?

3          A.    I might not have known that.

4          Q.    Did you know any of the other shareholders

00:28     5     or principal owners at that time?

6          A.    No.

7          Q.    Was there anybody else associated in working

8     capacity as far as you knew with Very Smart Networks

9     at the time you moved into the Infantino and Berman

00:28    10     offices?

11          A.    Well, Jack Duval was working up in

12     Jacksonville, and like I said, there was a

13     relationship with Donnie Lamey up there.  He was doing

14     the backbone work at St. Johns Estates, and there was

00:29    15     also talk about him doing the wiring, starting a

16     wiring company which ultimately happened up in the

17     Jacksonville area and that -- and those, some of those

18     clients were going to be and ultimately were John's

19     brothers who were contractors up that way.

00:29    20          Q.    Tell the jury what you mean when you said he

21     was going to start a wiring company.

22          A.    He had the expertise and knowledge to do it.

23     That meant -- that means that he was going to hire

24     guys to physically pull wire in houses.

25          Q.    And hook it up to some sort of a network so

1    that they could get these low voltage services?

2         A.   Correct.

3         Q.   And was this going to be in apartment

4    complexes or in individual residential houses?

00:29    5         A.   It could be either.  The other part of the

6    business plan of Very Smart Networks was to be a wire

7    subcontractor of low voltage so to speak for

8    individual houses, custom builders and mostly actually

9    big builders, big time residential builders.

00:30   10         Q.   To actually pull the wire but not run the

11   network?

12        A.   Correct.  And the goal was from that point

13   on to try if you got a -- let's say you had a big

14   group like D.H. Horton who wanted or was building --

00:30   15   let's see.  If you had a builder/developer, the big

16   people are builder/developers, we were investigating

17   ways to be a provider in a neighborhood as well.

18        Q.   And when you came on -- at the time you came

19   on board with Very Smart Networks, was it the same

00:31   20   time you moved into the offices at Infantino and

21   Berman?

22        A.   I think so.

23        Q.   And that was prior to the time that you put

24   a contract on the Harper Place project?

25        A.   Yes.  I would say so.

1      Q.    How much prior to that time?

2      A.    I don't know how much.

3      Q.    Less than a year?

4      A.    Yes.

00:31   5      Q.    Less than six months?

6      A.    Yes.

7      Q.    Less than three months?

8      A.    Yes.  I think if I -- if you wanted me to

9      put a range on it, I would say -- I was at Infantino

00:31   10     and Berman's longer than a month, but it might have

11     been as many as six months before we got Harper.  I'd

12     have to go back and try to figure the dates out.

13     Q.    Before you got Harper or before you signed

14     the contract?

00:31   15     A.    Signed the contract.

16     Q.    Someplace between one and six months after

17     you set up offices with Mr. Murphy at Infantino and

18     Berman, you and Mr. Murphy arranged a contract for the

19     Harper Place project; is that correct?

00:32   20     A.    It was after I moved in, yes.

21     Q.    Somewhere between one and six months?

22     A.    I'm guessing at that, yes.

23     Q.    Okay.  But is that your best estimate

24     sitting here today?

00:32   25     A.    Yes.  And I'm sure that I could figure it

1    out if you'd like to get more accurate.

2        Q.    Not necessarily.  You're here today and

3    we're trying to get the best of your recollection

4    sitting here today.

00:32    5        A.    That's right.

6        Q.    Had you had a discussion with Mr. Murphy

7    about what your job responsibilities and pay was going

8    to be at VSN before you set up shop with him?

9        A.    I don't remember any conversations like

00:32    10    that.

11        Q.    Were you getting paid for moving into that

12    office and starting to do work for VSN?

13        A.    I don't think I was getting paid right away.

14        Q.    And so far as you know there was no

00:32    15    discussion about you getting paid at the time you

16    moved in?

17        A.    There must have been, but I don't recall.

18        Q.    Had you or your wife or any of your wife's

19    families advanced any monies to VSN prior to the time

00:33    20    that you moved into the Infantino and Berman law

21    offices?

22        A.    My wife gave Very Smart Networks a loan, I

23    believe, in April of '02.  So --

24        Q.    My question was, before you moved in did

00:33    25    your -- did you, your wife or her family advance any

1    monies to them?  I don't know whether April of 2002

2    was before you moved in or not.  You need to tell me

3    the answer to that.

4         A.    I think we just -- didn't we just say that I

00:33   5    moved in in '01?

6         Q.    I thought so.

7         A.    Summer.  So no.

8         Q.    The answer is no then?

9         A.    Yes.

00:33   10    Q.    This gets very simple that way.

11        A.    Yes.

12        Q.    Thank you.  And your answer to the prior

13   question indicated that you must have had some

14   discussion about what your ultimate role with VSN was

00:34   15   going to be.  But you don't recall what that

16   discussion was sitting here today; is that correct?

17        A.    That's correct.

18        Q.    At some point in time prior to April of

19   2002, the date you say your wife puts money in, did

00:34   20   you start getting paid by VSN?

21        A.    Yes.

22        Q.    You recall approximately when that was you

23   started getting paid?

24        A.    No, I don't.

25        Q.    What was your rate of pay when you started

| | | |
|---|---|---|
| 1 | | getting paid? |
| 2 | A. | I don't recall.  I don't know. |
| 3 | Q. | No idea? |
| 4 | A. | Probably -- well, I'd be guessing, so no |
| 5 | real -- no real clear idea. | |
| 6 | Q. | Was it greater or less than $50,000 a month? |
| 7 | A. | It was less than that. |
| 8 | Q. | Was it greater or less than $20,000 a month? |
| 9 | A. | Less than that. |
| 10 | Q. | Was it greater or less than 10,000 a month? |
| 11 | A. | Less than that. |
| 12 | Q. | Was it greater or less than $5,000 a month? |
| 13 | A. | Less than that. |
| 14 | Q. | So you have some idea of what it was.  You |
| 15 | know it was at least below $5,000 a month, do you not? | |
| 16 | A. | Yes. |
| 17 | Q. | And when you started getting pay at whatever |
| 18 | rate you were getting pay, were you paid on a monthly | |
| 19 | basis? | |
| 20 | A. | Probably bi-weekly, bi-monthly. |
| 21 | Q. | And when you started getting paid did you |
| 22 | get your checks regularly, or would they start and | |
| 23 | stop? | |
| 24 | A. | At times they started and stopped. |
| 25 | Q. | And did anyone tell you the reason why your |

00:34
00:34
00:35
00:35

1    pay started and stopped?

2         A.    Yes.

3         Q.    And what was that reason?

4         A.    Cash flow.

00:35    5         Q.    And who told you that?

6         A.    Mr. Murphy.

7         Q.    So at some point in time in 2002 you were

8    aware that cash flow at VSN was very tight, correct?

9         A.    Yes.

00:36    10         Q.    And you knew that prior to the time that

11    your wife put any money in -- when in 2002 did she put

12    money did you say?

13         A.    She put in in April, I believe.

14         Q.    Do you have any recollection of

00:36    15    approximately how long you had been drawing a salary

16    from VSN at the time she put money in?

17         A.    No.

18         Q.    Do you recall whether or not you started

19    drawing a salary intermittent though it may have been

00:36    20    sometime in 2001?

21         A.    No, I don't.

22         Q.    Do you know if Mr. Murphy was drawing a

23    salary from VSN at that point in time?

24         A.    No, I don't.

25         Q.    I think you testified his title was CEO at

1      that time?

2             A.    I think so, yes.

3             Q.    And did you have a title at that time?

4             A.    I had titles at various times and I don't

00:36    5      know.  The highest I think I got was COO, chief

6      operating officer and I'm not exactly sure when I was

7      given that title.

8             Q.    And what did you do from day to day in your

9      role as an employee of VSN from the time you started

00:37   10      there when you moved into the offices of Infantino and

11      Berman in 2001?

12             A.    I'm sorry, could you say that again?

13             Q.    What did you do?

14             A.    While I was at -- when we were officing at

00:37   15      Infantino's office, I did a lot of -- we did have some

16      sales associates, field salespeople.  I was in charge

17      with meeting with them.  We had one stationed in Tampa

18      and we had one in Orlando and we had one in

19      Jacksonville, and so I kept track of all those sales

00:37   20      associates.  So my primary focus initially was

21      building sales.  At some point in time Mr. Ken Murphy,

22      John's uncle, came and joined the firm and he had a

23      lot more marketing, he started handling the marketing

24      and took over sales and I, by that time, had started

25      doing more of the field work.

MJC REPORTING, INC.

|    |    |                                                    |
|----|----|----------------------------------------------------|
| 1  | Q. | More of the what?                                  |
| 2  | A. | Field work.                                         |
| 3  | Q. | Field work.  Thank you.                             |
| 4  | A. | Running the crews and hiring and looking at         |

crews and so on and so forth.

6  Q.   So for approximately what period of time

7  were you involved in the sales activity?

8  A.   That -- let's see.  Six months to a year

9  maybe.

10  Q.   Had you had any prior sales experience?

11  A.   No, sir, not really, other than just

12  whatever I gleaned out of running my own business.

13  Q.   And these three salespeople that you had

14  supervisory control over, what kind of sales were they

15  engaging in in the three locations where they were?

16  Who were they trying to sell to?

17  A.   I think predominantly builders.  Home

18  builders.

19  Q.   New home builders?

20  A.   Correct.

21  Q.   To prewire the homes for low voltage

22  capacity?

23  A.   Correct.

24  Q.   And just so I understand so the jury

25  understands, when the homes are wired, do you then

00:38

00:38

00:39

00:39

1    have to have a service company to supply the service

2    to them like a Brighthouse?

3         A.   In some cases, yes.  Our ultimate goal was

4    to be able to compete with the service company.

00:39  5         Q.   Like Brighthouse?

6         A.   Like a Brighthouse, right.

7         Q.   And other cable companies?

8         A.   Correct.

9         Q.   Was it the goal of VSN to become another

00:39  10   cable company like a Comcast?

11        A.   Yes.  Ultimately, I would say so.

12        Q.   Like a Comcast or Brighthouse or Time Warner

13   or any of those other major ones we know about?

14        A.   Yes.

00:39  15        Q.   And did you have discussions with Mr. Murphy

16   as to whether or not the world was ready for another

17   cable company?

18        A.   Yes.

19        Q.   And the decision was, yes, the world was

00:40  20   ready for another cable company?

21        A.   Well, the decision -- the decisions were

22   always based on the changing in technology and

23   technology was, you know, as you know, it changes so

24   rapidly that we felt like we were on the -- in some

25   ways some of the cutting edge.

1           There was also at the same time, if I can

2      recall correctly, that the cable industry was being

3      deregulated or being forced to be deregulated and

4      there was that opportunity.  This was right at the

00:40    5      same time where cable was beginning to handle the

6      Internet connection and the newest stuff that was

7      still on the horizon was the voice over Internet,

8      which now you're seeing, you know, there's a big

9      article in today's paper.  So it was kind of a forward

00:41   10      looking company in -- from a technology standpoint.

11           Q.    Did Very Smart Networks have any franchises

12      with governmental authorities to permit them to

13      service either cable or computer, Internet or other

14      service to the residents of any particular

00:41   15      governmental city or county?

16           A.    That was what I think was being somewhat

17      done away with.  I think that the requirement of the

18      franchise or the licensing rights perhaps was one of

19      the things that opened the door for a company like

00:41   20      Very Smart Networks to get in and do.

21           Q.    Were you aware of other start-ups like VSN

22      that were trying to challenge people like Comcast and

23      Time Warner at that point in time?

24           A.    I was not -- I was aware that there were

25      other companies out there, yes.

1    Q.    How did VSN obtain its funding so far as you

2    knew?

3    A.    Well, I think that in the beginning VSN was

4    obtaining funding, a lot of funding from the apartment

00:42    5    complex at St. Johns Estates.

6    Q.    So that apartment complex was paying monies

7    out of its construction funds to start up VSN?

8    A.    Well, when I first started going up to

9    St. Johns Estates, it was not a -- completely still in

00:42    10    construction.  They were to a point where they had

11    tenants.  Some of the buildings were 100 percent

12    complete and occupied and probably when I got there

13    there may have been -- there were at they were at

14    least half done.  And so those tenants were paying

00:43    15    fees.

16    Q.    To VSN?

17    A.    I believe so.

18    Q.    You believe that VSN owned that network in

19    that apartment complex and it was a service provider

00:43    20    to the residents of that apartment complex?

21    A.    Yes, I think it was.

22    Q.    Do you know what the either monthly,

23    approximate monthly or annual cash flow off of that to

24    VSN was?

25    A.    I couldn't recall.  It was -- the numbers

MJC REPORTING, INC.

1   were, you know -- well, yes, I don't recall.

2   Q.   The approximate year where you were involved

3   in sales at VSN, would that have been some part of

4   2001 and some part of 2002?

00:43   5   A.   Yes.

6   Q.   At the time that your wife advanced funds,

7   either as a loan or as an equity infusion to VSN, were

8   you still in the sales side or were you in operations

9   by that point, field work by that point?

00:44   10   A.   I was probably still doing a little of both.

11   Q.   When you started doing the field work,

12   explain to me what the nature of your field activities

13   were.  What did you do?

14   A.   Well, we ultimately got some builders here

00:44   15   that we were working for and we had guys in trucks

16   riding out wiring houses every day.

17   Q.   Coordinating with the builder and pulling

18   the wire when the construction was at the level that

19   you could do that?  Is that what you were in charge of

00:44   20   doing?

21   A.   I was.  That was one of the things I did.

22   Q.   What else did you do besides pulling wires

23   and new construction or overseeing the pulling of

24   wires and new construction?

25   A.   I still looked over the sales and I helped

1       put the numbers together to make presentations for the

2       sales team.  For instance, there's a humongous

3       spreadsheet that we had that had numbers of units and

4       it tried to -- and it did estimate revenues and costs

00:45   5       and so on and so forth, and I put that together

6       several different times for Ken Murphy to go make

7       presentations to different apartment owners and so on

8       and so forth.

9            Q.   Had you had any experience with that level

00:45   10      of economic projection before?

11           A.   No, I had not.

12           Q.   So this was something new to you putting

13      together those kind of projections?

14           A.   It was fairly new to me, but it was a

00:45   15      spreadsheet that if you -- if you knew number -- if

16      you had numbers, you could break it down and it was

17      almost just plug, plug it in, and it went.  It was

18      created by Donnie Lamey initially.  It was a pretty

19      extensive spreadsheet.

00:46   20           Q.   It was an Excel spreadsheet?

21           A.   It was.

22           Q.   And you knew how to run an Excel

23      spreadsheet?

24           A.   I knew how to run it.  I figured out how to

25      use it and I would put it together for Ken's

1    presentations.

2         Q.    And would you come up with the estimates of

3    the number of customers that you anticipated would be

4    brought on-line and put that into the spreadsheet so

00:46    5    it could drive the rest of the revenue and expenses?

6         A.    I did not do -- I did not pick those numbers

7    alone, no.  That would not have been something I would

8    have done unilaterally.

9         Q.    Did you pick them along with the assistance

00:46    10    of somebody else?

11         A.    Yes.

12         Q.    With the assistance of whom?

13         A.    That would have been probably John, perhaps

14    Ken Murphy.

00:46    15         Q.    John Murphy and Ken Murphy?

16         A.    Ken Murphy would have maybe helped me.

17    Mr. Lamey may have helped me, Donnie, as long as he

18    was around.

19         Q.    Were these projections that came as a result

00:47    20    of these activities you just described used also by

21    VSN to obtain investment money?

22         A.    I don't believe that those particular --

23    those spreadsheets that I was using were mostly for

24    discussions with apartment developers or home, single

25    family home developers.

MJC REPORTING, INC.

1       Q.    Who at VSN if anyone was responsible for

2   raising investment capital to keep VSN moving ahead?

3       A.    John Murphy mostly.  Chris Taylor came down

4   to help do that along with Scott Smith.

00:47       5       Q.    When did you first meet Mr. Chris Taylor to

6   your recollection?

7       A.    I think that I met him here in Orlando and

8   it must have been December-January, and that would

9   have been January of '02.

00:48   10       Q.    So December '01 or January of '02?

11       A.    Anytime in that time period.  Probably, you

12   know, the first quarter of '02.

13       Q.    And were you introduced to Mr. Taylor and/or

14   Mr. Smith on one -- on an occasion in late 2001 or

00:48   15   early 2002?

16       A.    Yes.  I think that they traveled to Orlando

17   specifically to see us.

18       Q.    And what did you understand Mr. Taylor's

19   involvement with Very Smart Networks was?

00:48   20       A.    He was a person that was going to help us

21   raise capital.

22       Q.    And how do you know that?

23       A.    That's what he came to do.

24       Q.    How do you know that?

25       A.    My understanding -- I guess you're asking me

1    who told me that?

2          Q.    That would be a way to find out.

3          A.    John indicated that these gentlemen from New

4    York were coming and that that's what they did.

00:49    5          Q.    And, again, when you say John, that's John

6    Murphy?

7          A.    Yes.  I'm sorry.  Yes, it is, John Murphy.

8          Q.    So John Murphy told you that Mr. Taylor

9    and/or Mr. Smith were coming here for them to assist

00:49   10    VSN in raising funding, correct?

11          A.    Correct.

12          Q.    And did you participate in any meetings in

13    which Mr. Taylor or Mr. Scott were involved?

14          A.    Yes.

00:50   15          Q.    On how many occasions?

16          A.    I think they probably came -- I think they

17    came four our five times and I saw them on every

18    occasion.  They would spend a day -- they would at

19    least be here overnight usually, and so I would see

00:50   20    them for, I don't know, a couple hours, three hours on

21    any given day that they were in our office.

22          Q.    So they would usually come for an overnight

23    stay.  So two days in the office?

24          A.    Yes.  They were here two days and in some

25    cases we had appointments set up, they went out and

| | |
|---|---|
| 1 | talked to people, or they worked the phones.  But also |
| 2 | we didn't talk entirely about Very Smart Networks all |
| 3 | the time.  We did talk about other projects and other |
| 4 | things that they were working on. |
| 5 | Q.    So back to the time frame.  They came four |
| 6 | to five times, stayed two days each time, so that's a |
| 7 | total of eight to ten days during the early part of |
| 8 | 2002, correct? |
| 9 | A.    That would be a close assessment. |
| 10 | Q.    And you spent three hours a day with them? |
| 11 | A.    Yes.  Yes, sir.  Or more. |
| 12 | Q.    So we're talking at least 24 to 30 hours |
| 13 | over a period of several three or four months that you |
| 14 | spent with Mr. Scott or Mr. Taylor, correct? |
| 15 | A.    Yes. |
| 16 | Q.    And you talked not only about VSN but other |
| 17 | companies about which they were involved? |
| 18 | A.    Sometimes. |
| 19 | Q.    And who else would be involved in these |
| 20 | meetings that you had with Mr. Taylor and/or Mr. Smith |
| 21 | other than yourself? |
| 22 | A.    John Murphy typically was there.  And |
| 23 | typically Jack Duval attended some meetings.  And on a |
| 24 | couple of occasions we had some other Orlando men come |
| 25 | to the meetings. |

00:51
00:51
00:51
00:51

MJC REPORTING, INC.

| | | |
|---|---|---|
| | 1 | Q. Such as? |
| | 2 | A. One man is named Pat -- I forget his name. |
| | 3 | Patrick, oh, forgive me, Kepheart. |
| | 4 | Q. Pat Kepheart? |
| 00:52 | 5 | A. Patrick Kepheart. |
| | 6 | Q. How do you spell that? |
| | 7 | A. I would spell it K E P H E A R T, Kepheart. |
| | 8 | Q. Okay. |
| | 9 | A. And he had a partner. And I'm not so sure I |
| 00:52 | 10 | remember his name. |
| | 11 | Q. Were you present when Mr. Kepheart was |
| | 12 | involved in discussions with Mr. Murphy and/or |
| | 13 | Mr. Duval and/or Mr. Smith and/or Mr. Taylor? |
| | 14 | A. I was for some of it, yes. |
| 00:53 | 15 | Q. And what was the subject being discussed |
| | 16 | when Mr. Kepheart was there? |
| | 17 | A. Mr. Kepheart, we talked about Very Smart |
| | 18 | Networks and the business plan and so on there. We |
| | 19 | also talked about Xethanol. |
| 00:53 | 20 | Q. While Mr. Kepheart was there? |
| | 21 | A. Yes. |
| | 22 | Q. And was Mr. Kepheart there in order to raise |
| | 23 | money or to run the business or what? |
| | 24 | A. Mr. Kepheart actually was there maybe as a |
| | 25 | potential investor. |

1        Q.    Okay.  Maybe, but you're not sure?

2        A.    I think that would most likely be his reason

3    for being there.

4        Q.    And was he there on only one occasion that

00:53   5    you recall?

6        A.    He was there on at least one occasion that I

7    recall.

8        Q.    And how long did the discussion with

9    Mr. Kepheart go on?

00:53  10        A.    Oh, he was probably there for three hours.

11        Q.    And you participated for all of that three

12    hours?

13        A.    I don't know.

14        Q.    Some portion of it?

00:54  15        A.    Some part of it for sure.

16        Q.    And you mentioned that Xethanol was also

17    discussed when Mr. Kepheart was there?

18        A.    I have talked to him -- I think so.  I'm not

19    100 percent sure of that discussion.  I know that

00:54  20    Mr. Kepheart was, and his partner -- his partner's

21    name is Duane, by the way.  They were there.  We

22    talked about -- they were there when Chris Taylor and

23    Scott Smith were there.

24        Q.    Okay.  You started to say we talked about,

4      25    then you stopped.  Have you had some conversations

|   | |
|---|---|
| 1 | with Mr. Kepheart subsequent to that in which he has |
| 2 | told you what happened while he was there? |
| 3 | A.   No. |
| 4 | Q.   I think we're at a point when you were |
| 5 | telling me that Xethanol was also discussed when |
| 6 | Mr. Kepheart was there; is that correct? |
| 7 | A.   I believe it was. |
| 8 | Q.   Tell the jury what discussions were had |
| 9 | while Mr. Kepheart was there about this subject of |
| 10 | Xethanol. |
| 11 | A.   Well, whenever we would get together with |
| 12 | these guys there were -- |
| 13 | Q.   Let me stop you right there.  We're talking |
| 14 | only about Mr. Kepheart right now.  What was said |
| 15 | about Xethanol when Mr. Kepheart was there? |
| 16 | A.   I wouldn't remember his exact words. |
| 17 | Q.   You don't recall anything about what was |
| 18 | said about Xethanol when Mr. Kepheart was there; is |
| 19 | that a fair statement? |
| 20 | A.   A fairer statement would be that I do not |
| 21 | recall what Mr. Kepheart would have said about |
| 22 | Xethanol directly. |
| 23 | Q.   Then what did Mr. Taylor or Mr. -- the |
| 24 | gentleman's name was? |
| 25 | A.   Smith. |

00:54
00:54
00:55
00:55

MJC REPORTING, INC.

1     Q.    Scott Smith.  What did they say to

2     Mr. Kepheart about Xethanol?

3     A.    I think it would have been just general

4     conversation amongst all of us about all of those

00:55    5     kinds of companies.

6     Q.    So your response to the following question,

7     the question was, What did they say to Mr. Kepheart

8     about Mr. Xethanol?  And the they way Mr. Taylor and

9     Mr. Smith.  And your answer was, I think it would have

00:56    10     been just general conversation amongst all of us about

11     all of those kinds of companies.  First, do you recall

12     specifically while Mr. Kepheart was there any

13     discussion about Xethanol?  And if so, what was it?

14     A.    I'm sorry.  Are you asking me a new question

00:56    15     or are you reading me something?

16     Q.    I read you what your answer was.  Your

17     answer was I think it would have been just general

18     conversation amongst all of us.  Your answer was I

19     think it would have been.  Do you remember what the

00:56    20     conversation was?

21     A.    I don't remember directly, no.

22     Q.    So you'd be guessing as to what was

23     discussed about Xethanol?  Fair statement?

24     A.    Yes.

25     Q.    Let's now leave the conversation when

1    Mr. Kepheart was there and talk about other times you

2    were present with Mr. Taylor and/or Mr., I forget,

3    Scott Smith where Xethanol was discussed.  Did you

4    have such discussions or were you present when such

5    discussions were had by Mr. Taylor or Mr. Smith with

6    others where Xethanol was discussed?

7         A.    I don't recall any.  I would not recall any

8    specific instances other than the one time with --

9         Q.    Mr. Kepheart?

10        A.    Correct.

11        Q.    And with Mr. Kepheart you raised that

12   because you generally recall there was some discussion

13   about Xethanol, you just don't recall what it was?

14        A.    Yes.  And the reason I say that is because I

15   do know that Mr. Kepheart was one of the original

16   investors in Xethanol --

17        Q.    I'm sorry.  Go ahead.

18        A.    And I know that from seeing his name on the

19   stock register.

20        Q.    And the stock -- I'm sorry.

21        A.    And I have --

22        Q.    Go ahead.

23        A.    And I have spoken to him since about

24   Xethanol.

25        Q.    You saw his name on the stock register of

1    Xethanol after this litigation started, right?

2         A.    Yes.

3         Q.    So you didn't see the stock register with

4    Mr. Kepheart's name on it before this litigation was

00:58    5    initiated by you, correct?

6         A.    No.   I'll change that.   There is -- I did

7    get an e-mail from Mr. Murphy that, and I don't know

8    where it originated, that shows shareholders of

9    Xethanol and Mr. Kepheart's name is on it.

00:58    10        Q.    And I'll show you that e-mail.

11        A.    And it happened at about this same time.

12        Q.    I think I covered this question, but I want

13   to make sure that I have.   Do you remember any other

14   occasion when you were present with Mr. Taylor where

00:58    15   he discussed Xethanol except on the occasion when

16   Mr. Kepheart was there?

17        A.    I don't remember.

18        Q.    Do you have any documents or anything else

19   that would help refresh your recollection in that

00:59    20   regard?

21        A.    To pinpoint another time that I may have had

22   a discussion with Mr. Taylor about Xethanol?

23        Q.    Yes, sir.

24        A.    No.   I don't believe that I do.

25        Q.    And if you wanted to try to refresh your

MJC REPORTING, INC.

1       recollection as to whether or not you were present
2       when there was further discussion when you were
3       present with Mr. Taylor about Xethanol, where would
4       you go look to try to help you refresh your
00:59   5       recollection in that regard?
6               A.    I would not know where to look outside of
7       what I've already looked through.
8               Q.    You've looked at all the documents that you
9       produced in this case last week, the 2,500 and some
00:59   10      pieces of paper, right?
11              A.    I did not look at all of those, no.  No, I
12      did not.
13              Q.    Did you look at some of them?
14              A.    I looked at some of them, yes.
01:00   15              Q.    Did you look at any of those documents that
16      you had in the several boxes you carted to Savannah
17      for the Murphys' deposition?
18              A.    I looked at some of them, yes.
19              Q.    Did you see anything in any of those
01:00   20      documents that you had in your possession that would
21      have refreshed your recollection as to whether or not
22      you had conversations with Mr. Taylor or were present
23      when Mr. Taylor had conversations with other -- on the
24      subject of Xethanol, other than what you testified
25      about here today?

1          A.    I don't believe there to be any other

2     documents that would help me remember specific

3     conversations with Mr. Taylor about Xethanol.

4          Q.    I have principally mentioned Mr. Taylor's

01:00   5     name.  But you've also told me that from time to time

6     Mr. Scott Smith was present during the times when

7     Mr. Taylor was there.  Did you -- were you present

8     when Mr. Smith discussed with you or with others in

9     your presence Xethanol?

01:01   10         A.    I do not recall any specific times.

11         Q.    Generally do you recall that Mr. Smith

12    discussed Xethanol even though you don't recall the

13    specifics?

14         A.    Yes.

01:01   15         Q.    Generally what do you recall Mr. Smith

16    saying?

17         A.    I think Mr. Smith felt like the Xethanol,

18    the prospect of Xethanol becoming a very viable and

19    successful company was very real.

01:01   20         Q.    And even though you don't recall

21    specifically when Mr. Smith discussed that information

22    or what he specifically discussed, how often did

23    Mr. Smith discuss Xethanol during the four to five

24    times he came down here and you saw him?

25         A.    I wouldn't want to make a guess.  We

1    probably had a couple conversations over that course

2    of those times.

3         Q.    A couple, meaning approximately two?

4         A.    Yes.

01:02    5         Q.    Same question with regard to Mr. Taylor.

6    How often did Mr. Taylor generally discuss Xethanol on

7    those four to five visits or eight to ten days?

8         A.    I think generally the purpose of their visit

9    was to help us obtain financing for Very Smart

01:02    10    Networks, so other than just outside conversation it

11    wasn't the goal of their trip to talk about Xethanol.

12         Q.    During any of those times you generally

13    recall Mr. Smith and Mr. --

14         A.    Taylor.

01:02    15         Q.    -- Smith, Mr. Taylor discuss Xethanol, did

16    Mr. Smith and/or Mr. Taylor encourage you or others in

17    your presence to invest in Xethanol?

18         A.    I don't think -- I don't recall that

19    specifically happening, no.

01:02    20         Q.    Okay.  Do you generally recall that

21    happening?

22         A.    I generally don't recall that happening.

23         Q.    Thank you.  During any of those four to five

24    visits over eight to ten days, was any encouragement

25    made to you by Mr. Smith or by Mr. Taylor to invest in

1    Xethanol?

2         A.   I don't remember that happening.

3         Q.   Okay.  You heard your wife testify earlier

4    that on some occasion she met with Mr. Smith.  Were

01:03    5    you present when your wife was at a meeting in which

6    Mr. Smith was present?

7         A.   Yes.

8         Q.   Was that at a dinner meeting?

9         A.   Yes -- I'm sorry.  Go ahead.  I didn't mean

01:03   10    to --

11         Q.   Was it at a dinner meeting?

12         A.   Yes.

13         Q.   Do you recall what it was?

14         A.   And I wouldn't consider it a meeting.

01:03   15         Q.   It was an occasion?

16         A.   It was a function.

17         Q.   And who else was present?

18         A.   The Murphys were present.  It was Mr. Smith

19    for sure.  I don't think Mr. Taylor was there, but he

01:03   20    may have been.  I don't believe he was, though.

21         Q.   Do you recall where the meeting took -- the

22    dinner took place?

23         A.   We typically went to Del Frisco's.

24         Q.   And if you had to guess where it was, you

25    would guess it to be Del Frisco's?

MJC REPORTING, INC.

1          A.   I would guess it there, yes.

2          Q.   Do you recall any discussion by Mr. Smith on

3     that occasion about Xethanol?

4          A.   Yes.  However, I can't remember directly,

01:04     5     but I do know that he discussed it with my wife.

6          Q.   Okay.  Because she told you later that he

7     did?

8          A.   Yes.  I may have been standing there.  I may

9     not have been.

01:04    10          Q.   Sure.  Did she relate to you that Mr. Smith

11     had encouraged her to invest in Xethanol on that

12     occasion?

13          A.   No, she did not.

14          Q.   Thank you.  And again, the best of your

01:04    15     recollection is these four to five visits by Mr. Smith

16     and Mr. Taylor were to the best of your recollection

17     late 2001 to the mid part of 2002?

18          A.   That's the best of my recollection, although

19     they may have been coming into the fall of '02 as

01:04    20     well.

21          Q.   Okay.  Understood.  Tell me anyone else who

22     may have discussed Xethanol with you or in your

23     presence other than Mr. Smith or Mr. Taylor.

24          A.   From what period to what period?

5    25          Q.   From the beginning of time until the end of

1    2000 -- excuse me.  From the beginning of time

2    until -- yeah.  From the beginning of time until end

3    of 2002.

4         A.   The end of 2002?

01:05    5         Q.   Yes.

6         A.   Well, I spoke to -- I spoke about Xethanol

7    to Ken Murphy.  Ken was a big part of our company and

8    we talked with John and Ken and I talked a lot about

9    it.  Mr. Jack Duval and I spoke about Xethanol.

01:06   10    Again, Jack was the management guy with Very Smart

11    Networks amongst other things.  I spoke to John Murphy

12    about Xethanol obviously.  Let me think.  I have in

13    the past spoken to Mr. Infantino about Xethanol.

14         Q.   Prior to the end of 2002?

01:06   15         A.   I -- no, maybe not.  Maybe not prior to the

16    end of 2002.

17         Q.   Okay.  Anyone else?

18         A.   I think that Mr. Ken Shaw, who is another

19    associate of ours, and I had a conversation or talked

01:06   20    about Xethanol in the past.

21         Q.   And Mr. Shaw's first name is Ken; is that

22    right?

23         A.   Ken.

24         Q.   Anyone else?

25         A.   Yeah.  You know, once you put a deadline of

1    2002 on it, I don't know whether --

2        Q.    So you may have had conversations with

3    others after 2002?

4        A.    Yes.

01:07    5        Q.    Let's expand it out now to those that may

6    have happened after 2002.

7        A.    I have spoken to Patrick Kepheart about

8    Xethanol.  I obviously talked -- I have spoken to Tom

9    Infantino.  I have spoken to Bill Lowman who is our

01:07    10   attorney.  I have -- of course, since the case started

11   I've spoke --

12       Q.    I don't care about anybody since the case

13   started.

14       A.    Okay.

01:07    15       Q.    Okay.  When did you talk to Mr. Kepheart

16   about Xethanol?

17       A.    I called Patrick when I saw that the

18   share -- I think on-line I noticed that they had

19   announced a reverse merger.

01:08    20       Q.    When did that occur?  In 2005?

21       A.    That was -- no, I think that was in '04.

22   Fall of '04 I noticed some talk about it.

23       Q.    And did that prompt you to call

24   Mr. Kepheart?

25       A.    At some point I did call Mr. Kepheart.

1          Q.    After that event of the reverse merger,

2    after you finding out about the event of the reverse

3    merger?

4          A.    I saw an announcement of some sort, yes.

01:08    5          Q.    And what did you call Mr. Kepheart and talk

6    to him about?

7          A.    I wanted to find out whether he had received

8    any information regarding what I had seen on-line.

9          Q.    And what did he tell you?

01:08    10         A.    He indicated that he, yes, he thinks he did

11   have a piece of paper from the company and he

12   volunteered to fax it to me.

13         Q.    And did he do so?

14         A.    Yes, he did.

01:08    15         Q.    What did you talk to Tom Infantino about

16   with regard to Xethanol?

17         A.    I talked to Tom Infantino in June of '03 as

18   it related to our settlement.  He was at that point

19   working for the Murphys on the Murphy-Roll settlement

01:09    20   and he asked me about the shares of stock that we --

21   the certificates that we had.

22         Q.    And where were you when you had that

23   conversation with Mr. Tom Infantino?

24         A.    I was in his office, I believe.

25         Q.    During the course of negotiating the

1    separation of the Murphy and Roll interests?

2          A.   Yes.

3          Q.   Anyone else present besides yourself and

4    Mr. Infantino?

01:09   5          A.   I don't believe there was.

6          Q.   You were being represented by Mr. Lowman at

7    the time?

8          A.   Bill Lowman, yes, sir.

9          Q.   Had Mr. Lowman consented to you being

01:09   10   present talking to Mr. Infantino?

11         A.   Yes.

12         Q.   And what discussions did you have with

13   Mr. Infantino on that occasion?

14         A.   We were generally talking about some of the,

01:10   15   what I guess they considered out -- to be outstanding

16   issues and maybe some of the minute details.

17         Q.   And what discussions did you have with him

18   about Xethanol?

19         A.   He indicated that the Murphys wanted their

01:10   20   certificates back.

21         Q.   And what did -- how did you respond to that?

22         A.   I told him that, no, that the Xethanol

23   certificates were not up for negotiation.

24         Q.   And was that the end of that discussion?

25         A.   Yes.  Well, it was the end of the discussion

MJC REPORTING, INC.

1    that related to Xethanol.

2         Q.    As it related to Xethanol?

3         A.    Yes, it was.

4         Q.    And your conversations with Bill Lowman

01:10    5    regarding Xethanol, I don't know what they were

6    because he was acting as your counsel, but when were

7    they?

8         A.    They were around the same time.

9         Q.    Of June 2003 time frame?

01:10   10         A.    Yes, during settlement discussions.

11         Q.    Did you have conversations with Mr. Ken Shaw

12    about Xethanol -- I think you told me you didn't

13    recall when it was with Mr. Shaw, or you do recall

14    when it was?

01:11   15         A.    I didn't recall whether it was prior to or

16    after 2002, so I mean --

17         Q.    No matter when it was, what do you recall

18    being discussed with Mr. Shaw about Xethanol?

19         A.    I remember Mr. Shaw made a comment about

01:11   20    Mr. Murphy indicating that he would be giving Mr. Shaw

21    some shares of Xethanol in return for services and

22    work.   That was a very similar conversation that I had

23    with Mr. Duval.

24         Q.    Just a moment.   Let's do them one at a time.

25         A.    Okay.

1      Q.   Mr. Shaw indicated to you that Mr. Murphy

2   told him, Mr. John Murphy told Mr. Shaw that he might

3   be giving him some shares of Xethanol?

4      A.   Yes, I believe so.

5      Q.   Did Mr. Shaw tell you how many shares of

6   stock Mr. Murphy had said he was going to give to him?

7      A.   No.

8      Q.   Did you inquire?

9      A.   No.

10      Q.   What conversation did you have with

11   Mr. Duval about Xethanol?

12      A.   I believe Mr. Duval's comment was very

13   similar, that he had been told by Mr. Murphy that he

14   was going to receive some shares in Xethanol

15   Corporation, but that had not yet happened.

16      Q.   Did Mr. Duval indicate that the delivery of

17   shares of Xethanol to him was going to be based upon

18   something to have to do with VSN?

19      A.   No, he didn't indicate.

20      Q.   Did Mr. Duval indicate that Mr. Murphy was

21   just going to give him shares of Xethanol?

22      A.   That's what I understood him to be saying.

23      Q.   And where were you when Mr. Duval made this

24   comment to you?

25      A.   These comments, we were officing at that

1    time at the Lee Road office at Very Smart Networks and

2    I would believe that that's where it would have

3    happened.

4         Q.   Was the comment from Mr. Duval about

5    Xethanol shares and Mr. Murphy's intention to give him

6    some Xethanol shares, did that occur before or after

7    you received a stock certificate made out to your

8    trust in the amount of 150,000 Xethanol shares?

9         A.   After.

10        Q.   After.  Did you tell Mr. Duval that you had

11   received some shares of Xethanol?

12        A.   I don't recall.

13        Q.   When Mr. Ken Shaw told you about his

14   conversations with Mr. Murphy about Mr. Murphy giving

15   him some shares of Xethanol, did you tell Mr. Shaw

16   that you and your wife had received some shares of

17   Xethanol?

18        A.   I don't recall.

19        Q.   What discussion did you have with Mr. Ken

20   Murphy about Xethanol?

21        A.   Well, Ken and I received our shares at the

22   same time, so we discussed just in general.  Again, it

23   was just more office banter when we got our -- when we

24   got our shares I'm sure we thanks --

25        Q.   You said when we got our shares I'm sure we

1   thanks?

2       A.   Said thank you, I'm sorry.  Thanks to John

3   and then we probably discussed it a bit.

4       Q.   Well, that answer has two predicates to it

01:14   5   that usually sound like you're guessing at what the

6   answer is.  One is I'm sure we did and we probably

7   did.  --

8       A.   Sure and probably.  Sorry.

9       Q.   Do you recall having any discussions with

01:14   10  Ken Murphy about his receipt of shares of Xethanol?

11      A.   I -- Ken and I were standing there together

12  when we got our shares of Xethanol.

13      Q.   Okay.  Standing there in the offices on Lee

14  Road, correct?

01:15   15      A.   I believe it was Lee Road.  I'm not 100

16  percent sure it wasn't at Infantino's office.

17      Q.   Whether --

18      A.   It was in the offices that we shared all

19  three together.

01:15   20      Q.   All shared one office?

21      A.   No.  No.

22      Q.   All shared the same suite of offices?

23      A.   We were within the same space always.  I

24  don't think we ever -- we never moved and left someone

5   25  to move later, for instance.

MJC REPORTING, INC.

1    Q.    Was Mr. Ken Murphy in the offices at the

2    Infantino and Berman firm before the move was made to

3    Lee Road?

4    A.    Yes, he was, for a period of time.

01:15    5    Q.    And you recall Mr. Ken Murphy handing you a

6    share certificate Xethanol for both your trust and

7    your wife's trust at the same time he handed a share

8    certificate to Mr. Ken Murphy?

9    A.    John Murphy handed them to us, yes.

01:16    10    Q.    Yes.  John Murphy hand you two certificates,

11    one in your trust's name and one in your wife's

12    trust's name, correct?

13    A.    Correct.

14    Q.    And standing next to you was Mr. Ken Murphy

01:16    15    and he handed him a certificate also, correct?

16    A.    Correct.

17    Q.    Made out to him, correct?

18    A.    I didn't see the certificate to read it.  I

19    presume so, since --

01:16    20    Q.    Okay.  I don't want you to presume.  What

21    was said by Mr. Murphy when he handed the two

22    certificates to you?

23    A.    Here is your Xethanol certificates.

24    Q.    And were they in an envelope?

25    A.    No.

MJC REPORTING, INC.

1        Q.    Just two certificates in his hand that he

2     handed to you, correct?

3        A.    Correct.

4        Q.    And how close to you is Ken Murphy standing?

01:17   5        A.    Arms length.

6        Q.    To your right or left?

7        A.    I believe he was to my right.

8        Q.    And Mr. Murphy was standing -- Mr. John

9     Murphy was standing in the front of the two of you?

01:17   10       A.    Correct.

11       Q.    Did he hand your certificates to you first,

12    you and your wife's certificates to you first?

13       A.    I'm not sure.  And I don't know whether he

14    was standing.  It seems like he was walking out of his

01:17   15    office and whoever he came by first he handed in

16    that -- in one case it would have been Ken, so -- or

17    he might have had both of them out at the same time.

18    I don't really recall those details.

19       Q.    And you and Mr. Ken Murphy had been standing

01:17   20    there together before he came out -- before Mr. John

21    Murphy came out of his office, correct?

22       A.    Yes.

23       Q.    Talking about something not relating to

24    Xethanol, I presume?

25       A.    Probably.

MJC REPORTING, INC.

1       Q.   And John Murphy came out of the office, you

2   think first, gave something to Mr. Ken Murphy, and

3   then gave you two certificates, one made out to your

4   trust and one to your wife's trust, and he said what?

01:18   5       A.   I don't know his exact words.  I believe

6   that he indicated that those were shares --

7   certificates of Xethanol.

8       Q.   Are you certain that he mentioned the word

9   Xethanol as a part of this process?

01:18   10      A.   Actually I might not be certain.

11      Q.   Okay.  So you don't know what he said when

12  he handed the two certificates to you, correct?

13      A.   I don't know his exact words.

14      Q.   And you don't know that he said the word

01:18   15  Xethanol, correct?

16      A.   Correct.

17      Q.   Okay.  And you don't recall what you said if

18  anything in response to his handing you those two

19  certificates, correct?

01:18   20      A.   I would have said thanks, thank you.

21      Q.   No.  The question isn't what you would have

22  done.  My question is what you did do.  You don't

23  recall what you said if anything, correct?

24      A.   Correct.

25      Q.   And you don't recall what Mr. Ken Murphy

MJC REPORTING, INC.

1      said if anything when something was handed to him,

2      correct?

3           A.    Correct.

4           Q.    Do you recall when the move was made from

5      Infantino and Berman to the Lee Road location?

6           A.    I don't recall right now, but I could figure

7      it out if we needed to.

8           Q.    What would you look at to try to make that

9      determination?

10          A.    I would try to find my -- a calendar or I

11     would try to find some documents where all of a sudden

12     the address changed on the Very Smart Network

13     letterhead.  That would be the best way to do it.

14          Q.    Would there be anything in all those records

15     that you delivered to me last week that would indicate

16     to you what that date was?

17          A.    I'm not sure.  I'd have to go look.  There

18     very well may be.  Maybe the date changed -- maybe

19     there was a date change that could get us pretty close

20     on one of the development applications, for instance.

21          Q.    The stock certificate to you and your wife

22     was dated June --

23               MR. HARDY:  -- 19, 2002.

24          Q.    I'll take Mr. Hardy's word for it, June 19,

25     2002.  Do you recall whether the certificate delivery

MJC REPORTING, INC.

1    was made to you by Mr. John Murphy before or after

2    that date?  Or on that date?

3         A.   I don't recall the exact date that he handed

4    it to me.

01:20   5         Q.   And you don't recall whether it was after

6    the date of its issuance or whether it was before the

7    date of its issuance; is that correct?

8         A.   No.

9         Q.   Had you ever had discussions with John

01:21  10    Murphy prior to the date wherein he handed you the

11    certificate, one made out to yourself and one made out

12    to your wife?

13         A.   About Xethanol?

14         Q.   Yes.

01:21  15         A.   Yes.

16         Q.   And tell me about those discussions or that

17    discussion if there was only one.

18         A.   Well, you know, I worked with John for a

19    long -- what I would consider a long time.  We had

01:21  20    tons of conversations.  One of the things that we, I

21    do recall him talking about was Xethanol and the

22    opportunity that it would provide for our families --

23         Q.   And when -- I'm sorry.  Go ahead.

24         A.   -- and he and I, so --

25         Q.   When did he first mention to you about

1    Xethanol and the opportunities that it would provide

2    for your family and his family?

3         A.   I think that it was probably about the time

4    that February whenever those e-mails came from Chris,

01:22    5    and then there was the $10,000 that I wired -- it had

6    to be around February.

7         Q.   So February of 2002?

8         A.   Yes.

9         Q.   And when were you and Mr. Murphy told about

01:22    10    the opportunities that Xethanol could create for you

11    and your family and his family?

12         A.   Where was I physically?

13         Q.   Sure.  Where were you?

14         A.   I don't recall.  Probably in our office.

01:22    15         Q.   But you don't recall?

16         A.   His office or my office.

17         Q.   But you don't recall?

18         A.   No.

19         Q.   Do you recall if anyone else was present?

01:22    20         A.   I don't think anyone else was present.

21         Q.   And how long did you talk about Xethanol and

22    the opportunities that it could create for your family

23    on that occasion?

24         A.   Probably not long.

25         Q.   And was the conversation about Xethanol and

MJC REPORTING, INC.

1        the opportunities that it could create in connection

2        with any other subject on that -- at that time?

3              A.    Yes.

4              Q.    What other subject was it about?

01:23   5              A.    About the development opportunities, about

6        VSN opportunities, about just business things in

7        general.

8              Q.    You have related the time frame of that

9        conversation about the opportunities that Xethanol

01:23   10       could create to an e-mail that was dated in February

11       of 2002, correct?

12             A.    Yes.

13             Q.    An e-mail pursuant to which Mr. Murphy asked

14       you to send $10,000 to Xethanol, correct?

01:23   15             A.    Yes.

16             Q.    Did Mr. Murphy have any conversations with

17       you, face-to-face conversations, not e-mail

18       conversations, about sending $10,000 to Xethanol?

19             A.    I don't recall.

01:24   20             Q.    Did Mr. Murphy at any point in time, whether

21       it's in February or any other point in time, ask you

22       face to face or on the telephone, hey, Bill, I'd like

23       to have you send 10,000 to Xethanol?

24             A.    I'm sorry, did he ever at any other time?

25             Q.    Face to face or on the telephone ever say,

1    hey, Bill, I want you to send $10,000 to Xethanol?

2         A.   I don't recall that.

3         Q.   If it happened you don't remember?

4         A.   I do not, no.

01:24    5    Q.   So the only time you recall Mr. Murphy

6    making a request of you to send money to Xethanol was

7    pursuant to an e-mail he sent you; is that correct?

8         A.   No.   He may have said it.   I just don't

9    recall.

01:24    10   Q.   We're not here to figure out what might have

11   happened.   We're here to figure out what you recall

12   happening.   You don't recall any face-to-face or

13   telephonic conversations with Mr. Murphy, Mr. John

14   Murphy in which he asked you to send any money to

01:25    15   Xethanol; is that correct?

16        A.   I don't recall.   Yes.   That's correct.

17        Q.   Okay.   If it did happen you don't recall it

18   sitting here today?

19        A.   If it did happen I do not recall it sitting

01:25    20   here today, yes.

21        Q.   So on the occasion when Mr. Murphy said to

22   you that Xethanol would create a good opportunity for

23   your family, it wasn't -- that was a face-to-face or a

24   telephone conversation, correct?

25        A.   That was probably a face-to-face.

MJC REPORTING, INC.

| | | |
|---|---|---|
| 1 | Q. | Probably or was? |
| 2 | A. | It was -- it was a face-to-face discussion. |
| 3 | Q. | Just the two of you? |
| 4 | A. | Yes. |

01:25    5   Q.    And he said Xethanol is going to create good
6   opportunities for your family and my family?
7   A.    I wouldn't put those words in his mouth.
8   Q.    Well, what do you recall him saying?
9   A.    I think we were just having a general

01:26   10   discussion about the businesses that we were in and
11   Xethanol was one of them.  And Xethanol was an
12   opportunity for -- as were all of the other businesses
13   that we were in.
14   Q.    Well, in February of '02 you were not in the

01:26   15   Xethanol business with him, were you?
16   A.    I thought I was.
17   Q.    As a result of sending $10,000 to Xethanol
18   pursuant to an e-mail request he made to you?
19   A.    Yes.

01:26   20   Q.    That's how you thought you were in the
21   Xethanol business?
22   A.    I thought I was -- I thought I had purchased
23   shares of Xethanol stock, yes.
24   Q.    But you didn't have a face-to-face
25   discussion with Mr. Murphy in which he said, hey, I

1    want you to put up $10,000 to buy some shares of

2    Xethanol, correct?

3         A.   No.  I didn't say that I didn't have one.  I

4    said that I couldn't recall having one.

01:27  5         Q.   Well, how many shares of Xethanol were you

6    supposed to buy for $10,000?

7         A.   I didn't even know.

8         Q.   Never asked anybody?

9         A.   No, I did not.

01:27  10        Q.   And nobody told you?

11         A.   No.

12         MR. LINSCOTT:  Why don't we take a

13      break.

14         THE VIDEOGRAPHER:  Okay.  We're off the

01:27  15      record.  Time now is 3:05 p.m.

16      (Recess).

17         THE VIDEOGRAPHER:  Okay.  We're bark on

18      the record.  Time now is 3:17 p.m.

19    BY MR. LINSCOTT:

01:38  20        Q.   Mr. Roll, we've now established two

21    different occasions where you had some interaction

22    with Mr., three occasions where you've had some

23    interaction with Mr. Murphy about Xethanol.  One was

24    the e-mail he sent you in 2002?  Agreed?

25         A.   Yes.

1      Q.    One was when he handed the stock certificate

2   to you at the offices of VSN, correct?

3      A.    Yes.

4      Q.    And one was a time when he said to you that

01:39   5   Xethanol was going to create good opportunities for

6   your family and his family, correct?

7      A.    Yes.

8      Q.    Okay.  And you believe that the conversation

9   you had with him which he said that Xethanol was going

01:39   10   to create good opportunities for your family and his

11   family occurred in February of 2002, correct?  Yes?

12      A.    Yes.

13      Q.    But the reason you said that is because the

14   e-mail he sent to you asking for $10,000 to be sent to

01:39   15   Xethanol was also sent to you in February of 2002,

16   correct?

17      A.    Correct.

18      Q.    And you made the connection between the two

19   of those as meaning that the oral conversation about

01:40   20   opportunities likely occurred then, but you're not

21   sure of that, correct?

22      A.    Correct.

23      Q.    Any other conversations you had with

24   Mr. Murphy on the subject of Xethanol other -- either

25   conversations or e-mail exchanges -- strike that.  Let

1      me start all over again.  Any other oral
2      communications you had with Mr. Murphy on the subject
3      of Xethanol prior to the end of 2002?
4          A.    Not that I could recall enough to talk
5      about.
6          Q.    So you believe that we have touched all of
7      the oral conversations you've had with Mr. Xethanol
8      prior to the 2002 -- end of 2002 here today, correct?
9               MR. HARDY:  You said Mr. Xethanol.
10              MR. LINSCOTT:  Let me start all over
11         again.  You know when we get to be our age
12         three o'clock in the afternoon the brain
13         cells start dying.
14              MR. HARDY:  We both carry a Medicare
15         card since we last met.
16         Q.    I apologize.  It wasn't a trick question.
17     I'm not capable of asking.  You don't recall any other
18     oral conversations you had with Mr. Murphy prior to
19     the end of 2002 on the subject of Xethanol other than
20     what you've testified to here today; is that correct?
21         A.    Well, I don't recall any that I could be
22     definitive enough to discuss today.
23         Q.    Does that imply that you generally recall
24     there were other conversations and you just don't
25     recall what the subject of those other conversations

1    were?

2         A.    That means -- what I'm saying is Mr. Murphy

3    and I talked about Xethanol numerous occasions over

4    the course of that time period, and I can't sit here

01:41   5    and tell you exactly when and exactly how it came up

6    or exactly why we were talking about it, so.

7         Q.    Did any of those other conversations to

8    which you can't give definition because of the passage

9    of time deal with your acquiring stock of Xethanol?

01:42   10        MR. HARDY:   Object to the form.

11        A.    I don't recall, so.

12        Q.    If there were any such conversations you

13   don't recall?

14        A.    Correct.

01:42   15        Q.    Thank you.   Mr. Roll, I'm going to hand you

16   what has been previously identified in these

17   depositions as Exhibit No. 6, Defendant's Exhibit No.

18   6.   I will tell you that Defendant's Exhibit No. 6 did

19   not have those two Xethanol words circled and it did

01:43   20   not contain that handwriting where it says Delta

21   apostrophe S, number four.   Other than that, that's

22   Exhibit No. 6.   Have you ever seen this document

23   before, sir?

24        A.    Yes.

25        Q.    And what is it?

1          A.    It's an e-mail string, I think, starting

2    with Chris Taylor and ending -- going through John

3    Murphy to me.

4          Q.    I'm also going to hand you a document that's

01:44    5    been marked as an exhibit in this case as Defendant's

6    Exhibit No. 5 and ask you if you've ever seen that

7    before, sir.

8          A.    Yes.

9          Q.    Up at the top left-hand corner of Exhibit 5

01:44   10    is your name, Bill Roll.  Does this mean that you

11    printed out this exhibit from your e-mail address at

12    Very Smart buildings?

13          A.    Yes, sir, I think it does.

14          Q.    And when Mr. Murphy sent you his e-mail,

01:45   15    that is Exhibit No. --

16          A.    5.

17          Q.    I misspoke myself earlier when I told you

18    that this document was Exhibit No. 6.  It's actually

19    Exhibit No. 4.  It's Exhibit No. 4.  And Exhibit No. 4

01:45   20    appears on there.  Says Defendant's 4.  That in fact

21    is Defendant's 4.

22          A.    Okay.

23          Q.    When Mr. Murphy sent you Defendant's Exhibit

24    4, did the e-mail he forwarded to you from Mr. -- from

25    LondonManhattan contain the wire transfer information

1    that appears on Defendant's Exhibit 5?

2         A.   Are you saying -- are you asking if this

3    piece of information was incorporated into this hole

4    down here?

01:46    5         Q.   Yes.

6         A.   It very well may have been.  I'm not sure.

7         Q.   And we'll get to in a moment to what

8    happened after that.

9         A.   Okay.

01:46   10         Q.   Let's focus for a moment on a portion of

11    Defendant's Exhibit 4 which is Mr. John Murphy's

12    e-mail to you.

13         A.   Okay.

14         Q.   In which Mr. Murphy says to you, Let me know

01:46   15    if you can wire 10,000 -- there's no dollar sign

16    there.  But did you take that to mean $10,000?

17         A.   Yes.

18         Q.   -- to complete our obligation.  You see

19    that, sir?

01:46   20         A.   Yes.

21         Q.   Did you have some conversation with

22    Mr. Murphy about that obligation?

23         A.   You know, yes -- I don't know.  I can't

24    recall that.

25         Q.   Okay.  Mr. Murphy then goes on to say, I

1      will be able to reimburse on the Casa funding.

2           A.   I see it.

3           Q.   Did you have some discussion about that?

4           A.   No.  Not that I recall.

01:47   5           Q.   Okay.  Did you ask Mr. Murphy about what he

6      meant when he said he would reimburse the $10,000 from

7      the Casa funding?

8                MR. HARDY:  Object to the form.

9           A.   No.

01:47  10           Q.   Did you know what he was referring to when

11      he referred to Casa?

12           A.   Yes.

13           Q.   And what was he referring to?

14           A.   I understood Casa to mean the development

01:47  15      project Casa Cielo.

16           Q.   A project that Mr. Murphy and his wife were

17      engaged in at that point in time, correct?

18           A.   That they amongst others were engaged at

19      that time, yes.

01:47  20           Q.   You and your wife Hope Roll were not

21      involved in the Casa project at that time, correct?

22           A.   Correct.

23           Q.   You and your wife did not get engaged in the

24      Casa matter at all until October of 2002, correct?

25           A.   Correct.

MJC REPORTING, INC.

|    |    |                                               |
|----|----|-----------------------------------------------|
| 1  | Q. | Did you receive a reimbursement from Casa     |
| 2  | for $10,000?                                       |
| 3  | A. | No.                                           |
| 4  | Q. | Did you ever ask for it?                      |
| 5  | A. | No.                                           |
| 6  | Q. | Why not?                                      |
| 7  | A. | I don't know.  I did receive a                |
| 8  | reimbursement.                                     |
| 9  | Q. | I'm sorry?                                    |
| 10 | A. | I did receive a partial reimbursement.        |
| 11 | Q. | Of that $10,000?                              |
| 12 | A. | Yes.                                          |
| 13 | Q. | When?                                         |
| 14 | A. | Sometime later.                               |
| 15 | Q. | From who?                                     |
| 16 | A. | Mr. Murphy, I would imagine.                  |
| 17 | Q. | From Mr. Murphy's personal account or a       |
| 18 | company account?                                   |
| 19 | A. | It says -- actually I don't know where it     |
| 20 | came from.                                         |
| 21 | Q. | But you do recall that you received some      |
| 22 | portion of that $10,000 as a reimbursement?        |
| 23 | A. | Yes.                                          |
| 24 | Q. | And how were you aware that that money you    |
| 25 | received was a reimbursement of this $10,000?      |

1    A.   I indicated in the check -- my company check
2    register reimbursement.

3    Q.   And do you recall how much it was?

4    A.   $5,000.

01:49    5    Q.   And was that check register a portion of the
6    documents you delivered to me on Friday of last week
7    or on Wednesday of last week?

8    A.   Oh, that one, no, I don't believe so.

9    Q.   So you have a check register someplace in
01:49    10   which you noted that the -- that you received a $5,000
11   reimbursement of this $10,000 you sent to Xethanol but
12   you didn't produce it?

13   A.   Well, yes, because that was my W.C. Roll
14   account and, I'm sorry, I didn't -- it's not -- that
01:49    15   account was not ever relative business between Murphy
16   and myself.

17   Q.   How long would it take you to locate that
18   notation in your W.C. Roll account that $5,000 came
19   back as a reimbursement of that $10,000 advance?  Do
01:50    20   you have those records available to you?

21   A.   Yes, I do.

22   Q.   Would you be able to find it by tomorrow?

23   A.   Yes.

24        MR. LINSCOTT:   I would ask that you do
25        so, and for planning purposes -- let's go

|   | 1 | off the record. |
|---|---|---|
|   | 2 | THE VIDEOGRAPHER:  We're off the |
|   | 3 | record.  Time is 3:28 p.m. |
|   | 4 | (Discussion off the record). |
| 02:02 | 5 | (Recess). |
|   | 6 | THE VIDEOGRAPHER:  Okay.  We're back on |
|   | 7 | record.  Time now is 3:41 p.m. |
|   | 8 | BY MR. LINSCOTT: |
|   | 9 | Q.   Mr. Roll, after you received the e-mail from |
| 02:03 | 10 | Mr. Murphy that is Exhibit No. 4, what did you do? |
|   | 11 | A.   I did wire ultimately $10,000 into |
|   | 12 | Xethanol's account. |
|   | 13 | Q.   Do you recall if you did it on the same day |
|   | 14 | as Exhibit No. 4, the same day as Mr. Murphy's e-mail |
| 02:03 | 15 | to you of February 8, 2002? |
|   | 16 | A.   I think it went on the same day, yes, sir. |
|   | 17 | Q.   How did you make arrangements for that wire? |
|   | 18 | A.   I'm sorry.  I called the bank and gave them |
|   | 19 | the instructions. |
| 02:04 | 20 | Q.   Which bank? |
|   | 21 | A.   I was banking at Bank of Central Florida on |
|   | 22 | Lee Road. |
|   | 23 | Q.   You recall what account it came out of? |
|   | 24 | A.   It came out of W.C. Roll Construction |
|   | 25 | Company. |

MJC REPORTING, INC.

1          Q.    And why did you use that account?

2          A.    Well, I'm not sure exactly why I used that

3    account, but that account had $10,000 in it, so the

4    money was available.

02:04    5          Q.    And do I understand your testimony to be

6    that you thought you were buying shares of Xethanol

7    with that $10,000?

8          A.    Yes.

9          Q.    And what caused you to come to that

02:04    10   conclusion?

11         A.    Well, I thought I was investing in the

12   company Xethanol.

13         Q.    And what caused you to come to that

14   conclusion that you were investing in the company

02:05    15   Xethanol?

16         A.    I'm sure discussions with John Murphy.

17         Q.    Discussions which you don't recall.

18         A.    Yes.  I'm sorry.

19         Q.    Okay.  I just wanted to make sure that they

02:05    20   were discussions which you don't recall?

21         A.    Yes.

22         Q.    And you don't recall if there was discussion

23   about how many shares would be issued in return for

24   $10,000, correct?

25         A.    Yes.

MJC REPORTING, INC.

```
         1            Q.    That is correct?

         2            A.    That is correct.

         3            Q.    Mr. Roll, I'm going to hand you what has

         4     been previously identified in this matter as

02:06    5     Defendant's Exhibit No. 11.  You ever seen that

         6     document before, sir?

         7            A.    Yes.

         8            Q.    And what is it?

         9            A.    It's a certificate of shares of Xethanol

02:07   10     Corporation.

        11            Q.    Issued to who?

        12            A.    To the William C. Roll Trust.

        13            Q.    Is there such a trust known as the William

        14     C. Roll Trust?

02:07   15            A.    Yes.

        16            Q.    And do you know when that trust was created?

        17            A.    I think that trust was created in February

        18     of '01.

        19            Q.    Do you know who the trustee of that trust

02:07   20     is?

        21            A.    Yes.

        22            Q.    Did you ever have occasion to discuss that

        23     trust with Mr. John Murphy?

        24            A.    No.  But since you bring it up he must have

        25     asked me how I wanted these certificates titled to put
```

1        it in the trust's name.

2                Q.    But you don't recall that?

3                A.    I don't recall that.

4                Q.    Is Exhibit No. 11 the document that was, one

02:08   5        of the documents that was handed to you by Mr. Murphy

6        at the offices of Very Smart Networks at the time

7        Mr. Ken Murphy was standing right next to you?

8                A.    Yes.

9                Q.    And is the other of the documents was handed

02:09   10       to you on that date, Exhibit No. 24?

11               A.    Yes.

12               Q.    And Exhibit No. 24 is made out to the Hope

13       C. Roll Trust?

14               A.    Yes, it is.

02:09   15               Q.    And, again, you don't have any recollection

16       of any discussion you had with Mr. Murphy asking him

17       to have the shares of stock Xethanol made out to your

18       trust and your wife's trust; is that correct?

19               A.    I'm sorry?

02:09   20               Q.    You don't have any recollection of having

21       had a discussion with Mr. Murphy in which you asked

22       him to have your shares of Xethanol made out to your

23       trust and your wife's trust; is that correct?

24               A.    No.   I remember him asking me how to do it

25       and me answering, put it in the trusts' names like

MJC REPORTING, INC.

1    this.

2            Q.    When did that occur?

3            A.    That would have occurred prior to me

4    receiving these.  I don't know the exact date.

02:09    5            Q.    Do you recall an approximate time frame?

6            A.    It would have been in June of '02.  May or

7    June of '02.

8            Q.    So that's another conversation you had with

9    Mr. Murphy about Xethanol stock, correct?

02:10    10           A.    Yes.  You've -- yes.

11           Q.    Where did that conversation take place?

12           A.    It would have had to have taken place at the

13   office.

14           Q.    Tell me who was present.

02:10    15           A.    I can't tell you who was.  I remember

16   vaguely him asking me how to title these certificates

17   and me answering, so.

18           Q.    And what was being discussed at the time

19   that he asked you that question?

02:10    20           A.    It must have been about Xethanol

21   Corporation.

22           Q.    Was there any reference in that conversation

23   to the $10,000 you had sent to Xethanol some three or

24   four months before that?

25           A.    I don't recall.

1        Q.    Was there any conversation -- had there been

2   any discussion before that occurred, the discussion

3   you've just now recalled in May or June of 2002, about

4   your family, you or your wife giving any financial

02:11   5   support to Casa Cielo?

6        MR. HARDY:  Object to the form.

7        Q.    You may answer.

8        A.    No.

9        Q.    When did you first have a conversation with

02:11   10  Mr. Murphy or Mrs. Murphy about advancing monies to

11  Casa Cielo, either through you or your wife?

12       A.    I don't have a recollection of a date.

13       Q.    Do you have a recollection as to whether it

14  occurred before or after the date that your wife Hope

02:11   15  Roll did a 1031 exchange on the Wymore Road property?

16       A.    The exchange isn't really complete until

17  that backside of it is completed.

18       Q.    I understand that.

19       A.    So when you ask me that she did an exchange,

02:12   20  you're saying that it was October to me.

21       Q.    Let me take away your confusion perhaps.

22  Did your conversation with Mr. Murphy about how those

23  two certificates No. 11 and 24 should be titled occur

24  before or after the date of sale to the Fields

2   25  organization of the Wymore Road property which is July

1        2nd of 2002?

2        A.    The Murphy -- the conversation with John

3    Murphy about how to title these two shares would have

4    had to occur prior to the date that Chris typed it,

02:13    5    so, and I am -- and I don't know the date that Chris

6    typed it, but it looks like it was about June, early

7    June.

8        Q.    Let me try -- I'm not --

9        A.    Okay.

02:13    10       Q.    I'm not doing a very good job of asking my

11    questions, and I apologize for that.  Let me try and

12    make it slightly clearer for you.  You've heard

13    testimony from your wife that the Wymore Road property

14    transaction closed on July 2nd, 2002.  Did you

02:13    15    remember that testimony from this morning?

16       A.    July 2nd, yes.

17       Q.    Okay.  Do you agree with that date?

18       A.    Yes.  I read the papers as well.

19       Q.    So you have no reason to disagree that the

02:13    20    sale of the property by the Clayton interest to the

21    Fields people occurred on July 2nd, 2002, correct?

22       A.    I have no reason to think that's not the

23    case.

24       Q.    Were you aware that that sale was going to

25    occur to the Fields organization in the days and weeks

1      prior to the actual closing of that transaction?

2           A.   Oh, I'm sure I was.

3           Q.   It had been in discussion stages for some

4      period of time before July 2nd, correct?

5           A.   I'm sure that it was.

6           Q.   And before it closed, did you and Hope have

7      some conversation that the proceeds that she was going

8      to receive from that sale would be used for a 1031

9      exchange in order to reduce her current tax liability

10     for that?

11          A.   Yes.

12          Q.   So before July 2nd you discussed with your

13     wife that she ought to do a 1031, correct?

14          A.   Yes.

15          Q.   And before July 2nd, 2002, did you discuss

16     with your wife what possibilities existed out there

17     for exchanged property to be used in that exchange?

18          A.   However, I need to say one thing.  In

19     properties that these, the Clayton children owned

20     together in many cases it's a trust scenario, and if

21     they own the properties in the trust, then the -- and

22     any one of them wants to do a like kind exchange, then

23     they all have to do a like kind exchange.  Therefore,

24     in some cases in the past, I think we've cleared it up

25     now, but in the past, and this may have been one of

1    them, the trust officer, whoever that may have been at

2    the time, can arbitrarily decide for the whole group

3    that it's going to go to an exchange agent.

4        Q.   And you don't know if that happened in this

02:15    5    case or not?

6        A.   And I don't remember that that happened in

7    this case.

8        Q.   But you knew before July 2nd that the deal

9    with the Fields was going to close?

02:15    10        A.   I knew that we had a contract.  You never

11    really know if they are going to close.  Yes.

12        Q.   You were planning as though it would close

13    with the Fields organization, correct?

14        A.   Yes.

02:16    15        Q.   And did you have a discussion with your wife

16    about exchange property in the event it turned out to

17    be a 1031 exchange?

18        A.   Oh, I'm sure we did.

19        Q.   Before July 2nd?

02:16    20        A.   Yes.  I'm --

21        Q.   And did you identify Casa Cielo as being a

22    potential candidate for exchanged property for July

23    2nd?

24        A.   No, I would not say that.  I would say no.

25        Q.   Did you have a discussion with TREP being a

1      candidate for exchange property before July 2nd?

2              A.   No, I would say not.

3              Q.   So if you had discussions with your wife

4      about the proceeds of the Fields transaction being

02:16      5      used in a 1031, what property did you identify before

6      July 2nd as a potential candidate for that?

7              A.   Perhaps none.

8              Q.   But perhaps Casa Cielo?

9              A.   No.  No.  Definitely not.

02:17     10              Q.   And not TREP either?

11              A.   No.  I think that the discussion -- the

12      first discussions you typically have is when we close

13      on July 2nd are we going to effect the process of a

14      1031.  That's the first decision.  And that's all you

02:17     15      really need to do to get to closing.

16              Q.   I understand that.

17              A.   Okay.

18              Q.   That's all you need to do.  But there's

19      nothing that prohibits you from identifying like kind

02:17     20      property before the closing actually occurs; is that

21      correct?

22              A.   That is correct.

23              Q.   So it's possible, whether you did it or not,

24      it's possible in order to accommodate a 1031 exchange

25      to identify, say, a Casa Cielo property or a TREP

1    property even before the Fields deal closed, correct?

2              MR. HARDY:  Object to the form.

3         Q.   You may answer.

4         A.   It is possible, yes.

02:18

5         Q.   You just testified to me today that you're

6    sure that didn't happen, though?

7         A.   I don't believe that happened, no.

8         Q.   When did you first discuss with your wife

9    that Casa Cielo could be a candidate for a 1031

02:18

10   exchange with regard to the Fields transaction?

11        A.   I remember the Casa Cielo coming up as an

12   option as we were trying to decide how to do it.

13   Because once it goes to Starker, you're not touching

14   -- touching it, you have two choices once you've

02:18

15   committed.  Get your money back and pay the taxes, or

16   have something accomplished at that 45-day period.  So

17   I remember the reason that Casa came up was because we

18   understood that Stewart Gilman and his partnership

19   group wanted out.

02:19

20        Q.   And how did you find that out?

21        A.   Mr. Murphy, John Murphy.

22        Q.   And where were you when Mr. Murphy informed

23   you of that?

24        A.   I don't remember.  Probably at the office.

25        Q.   Were you advised by Mr. Murphy of that in

1    face-to-face conversations or e-mails?

2         A.   Face to face probably.

3         Q.   Was anyone else present?

4         A.   I don't recall.

02:19   5         Q.   And do you recall whether or not that

6    conversation with Mr. Murphy occurred before or after

7    July 2nd, 2002?

8         A.   It was after.

9         Q.   And how do you know that?

02:19   10        A.   Because it didn't happen until much later in

11   the summer, closer to when we got the -- August, when

12   we started seeing these e-mails is how I know it.

13        Q.   When you started seeing what e-mails?

14        A.   You have an e-mail here that says this is

02:19   15   what we think we're going to do that's in August of --

16   late August.

17        Q.   August 26?

18        A.   Yes.

19        Q.   By August 26 the 45 days had run; is that

02:19   20   correct?

21        A.   I don't believe so.  I don't know.  Sorry.

22   I didn't mean to mess you up.

23        Q.   That's all right.  They are there for

24   everybody.  I show you what was Exhibit 21 in your

25   wife's deposition this morning.  Can you look at that

MJC REPORTING, INC.

|   |   |   |
|---|---|---|
| 1 |  | and tell me what the date for identification of the |
| 2 |  | property was? |
| 3 | A. | 8/16. |
| 4 | Q. | So August 26 is after the date -- |
| 5 | A. | So I was mistaken. |
| 6 | Q. | You were mistaken. |
| 7 | A. | Yes. |
| 8 | Q. | So when did you first have a conversation |
| 9 |  | with Mr. Murphy in which he told you Mr. Gilman wanted |
| 10 |  | out of Casa Cielo? |
| 11 | A. | It must have been in late summer like I just |
| 12 |  | said. |
| 13 | Q. | What makes you so certain it couldn't have |
| 14 |  | been in June? |
| 15 | A. | What makes me -- |
| 16 |  | MR. HARDY:  Object to the form. |
| 17 | Q. | The question was what makes you so certain |
| 18 |  | it couldn't have been in June? |
| 19 | A. | I don't believe it was in June. |
| 20 | Q. | Why? |
| 21 | A. | I don't know. |
| 22 | Q. | If Mr. Murphy says it's in June, would he be |
| 23 |  | lying? |
| 24 |  | MR. HARDY:  Object to the form. |
| 25 | Q. | You may answer. |

02:20
02:20
02:20
02:21

MJC REPORTING, INC.

1          A.    I don't know.

2          Q.    When Mr. Murphy told you, whenever it was,

3     that Mr. Gilman wanted out of Casa Cielo, what did you

4     say in response to that?

02:21    5     A.    That -- well, that -- the conversation I'm

6     sure was that basically that this was an opportunity

7     to effect a 1031 within Casa, so I would have, without

8     knowing exactly what I said, I would have said that

9     we -- I needed to speak to Hope about it.

02:22   10     Q.    But you were likely aware of the Fields

11    transaction at least two weeks before the Fields

12    transaction closed on July 2nd, would you not?

13         A.    Was it likely that I was aware of it?

14         Q.    Yes.

02:22   15     A.    Yes.

16         Q.    Had your wife engaged in other property,

17    sales of property that was from her family interests

18    before 2002 that resulted in 1031 exchanges?

19         A.    I think they had.

02:22   20     Q.    So this would not have been, this Fields

21    property on Wymore Road would not have been the first

22    time your wife engaged in a 1031 exchange, correct?

23         A.    Correct.

24         Q.    How many --

3    25     A.    I don't believe it was the first time.


MJC REPORTING, INC.

1       Q.   How many times prior to July of 2002 would

2   you estimate she had engaged in 1031 exchanges?

3       A.   I don't know.  I don't even know.

4       Q.   Sitting here today how many 1031 exchanges

5   do you recall her engaging in with property that came

6   to her through her Clayton family interests?

7       A.   It's probably happened a couple or several

8   times.  I'm --

9       Q.   A couple meaning two, several meaning three?

10      A.   Not hundreds, but maybe not even more than

11  ten.  I don't know.

12      Q.   Okay.  But perhaps as many as ten?

13      A.   More than once.

14      Q.   More than once and --

15      A.   This is once.  The -- they could have done

16  it -- they have done it in the past.

17      Q.   But not more than ten?

18      A.   I would imagine not.  But maybe I'm wrong

19  there, too.  I don't know.  I don't know everything

20  they do.

21      Q.   None of us do.

22      A.   It's impossible.

23      Q.   Mr. Hardy probably does.  I sure don't.  Is

24  it possible that some of those 1031 exchanges with

25  respect to your wife's Clayton family property

1    occurred before June of 2002?

2         A.    Yes.

3         Q.    And in those occasions when that occurred

4    that your wife engaged in 1031 exchanges, did she

02:24    5    consult with you or at least advise you of the need to

6    find exchange property to qualify?

7         A.    I'm sure that we have talked about it.

8    Again, though, in the past when those trusts did

9    things and typically the trustee acted as a trustee

02:24    10    for the group, and so there was a time there where

11    even the beneficiaries weren't or didn't have to be

12    brought into any kind of decision.  So typically Hope

13    and I did know about it, though, I would say.

14         Q.    Mr. Roll, I'm going to hand you what's been

02:26    15    marked for identification as Defendant's Exhibit No. 6

16    and I'd like to have you look at that together with

17    Exhibit No. 4.  First, can you tell me what Exhibit

18    No. 6 is?

19         A.    This is the -- it looks like a computer

02:27    20    printout of the wire, something to do with the wire

21    that I sent from W.C. Roll to Xethanol.

22         Q.    And do you see up at the very top right-hand

23    corner where it says February 8, 2002, 16:35?  Top

24    left-hand corner.  I'm sorry.

25         A.    Yes, it does.

MJC REPORTING, INC.

1     Q.    If you look at Exhibit No. 4 the e-mail that

2     came to you from Mr. Murphy was at 2:49; is that

3     correct?

4     A.    Yes.

02:27     5     Q.    P.m., correct?

6     A.    Yes.  That's what it says.

7     Q.    So within an hour and 40 minutes you had

8     made arrangements to wire monies to Xethanol?

9     A.    Yes, evidently.  Although, let me ask you a

02:28     10    question.  Maybe this is -- this is -- doesn't this

11    thing have the real time on it?  That February 8,

12    16.35, is that from the fax machine perhaps?

13    Q.    I don't know.  You tell me.

14    A.    I don't know.  That's what it looks like is

02:28     15    a fax date and time stamp.

16    Q.    So you don't believe that that February 8

17    day represents the date that the monies were wired?

18    A.    No.  I believe it's the date -- oh, here it

19    is down here.  Here is the 16:27, so, yeah, it would

02:28     20    make sense.  See below where it says fund short

21    acknowledgement?  16:27 is several minutes, and then

22    they faxed me the confirmation at 16:35, so that makes

23    sense.  Sorry.  I didn't mean to confuse.

24    Q.    So you confirm that within an hour or so

25    after you received an e-mail from Mr. Murphy

1    requesting the that $10,000 be sent to Xethanol, you

2    complied with that request?

3         A.   Yes.

4         Q.   And you don't recall any conversation you

02:29  5    had with Mr. Murphy between the e-mail you received

6    which is Exhibit 4 right and the monies you wired out?

7         A.   I don't recall any specific details.

8         Q.   And after you wired the monies, the $10,000,

9    you further don't recall any conversation you had with

02:29  10   Mr. Murphy about that $10,000, correct?

11        A.   Not particularly, no.

12        Q.   But you do recall receiving a reimbursement

13   of some portion of that $10,000?

14        A.   Yes, I do.

02:29  15             MR. LINSCOTT:  Let me take a break and

16             have some copies made of this.  I just have

17             one here.

18             THE VIDEOGRAPHER:  We're off the

19             record.  Time is 4:08 p.m.

02:29  20                  (Recess).

21             THE VIDEOGRAPHER:  We're back on the

22             record.  Time now is 4:12 p.m.

23                  (Document marked for identification

24                  Defendant's Exhibit No. 30).

25   BY MR. LINSCOTT:

MJC REPORTING, INC.

1     Q.    Mr. Roll, I've handed you what's been marked

2     for identification as Defendant's Exhibit 30.  Can you

3     tell me what that is, please?

4          A.    This is a three-stub, copy of three check

02:34     5     stubs from my checkbook W.C. Roll Construction, Inc.

6     and the -- I guess what you're asking -- is that what

7     you --

8          Q.    Yes.  This is a check stub, one page of a

9     check stub out of your account for a company which you

02:35    10     were the sole shareholder of W.C. Roll Construction,

11     Inc.; is that a fair statement?

12          A.    That's correct.

13          Q.    And you had called during this deposition to

14     your home to have your wife fax this to you because I

02:35    15     believe you indicated that this document would

16     represent a portion of repayment of the monies which

17     you wired to Xethanol pursuant to Defendant's Exhibits

18     4 and 5; is that correct?

19          A.    Yes, sir.

02:35    20          Q.    And where on Exhibit No. 30 does it appear

21     that you were reimbursed for some portion of the

22     monies that you wired to Xethanol?

23          A.    On the top, the first check is check number

24     5024, and as you see on the deposit side there's a

25     $5,000 entry, to the left of that, there's a notation

MJC REPORTING, INC.

1    that says repay Xethanol.  That's all I have on the
2    matter.

3         Q.   Were you advised by Mr. Murphy or anyone
4    that this $5,000 was a repayment of a portion of the
5    $10,000 represented by the wire you sent to Xethanol?
6         A.   I'm sorry.

7         Q.   Let me ask the question again.

8         A.   I'm sorry.

9         Q.   How did you know that Exhibit No. 30, the
10   first check, 5024 or the first deposit 5024 was a
11   deposit of the Xethanol monies?

12        A.   I don't know sitting here today.  I can't
13   tell you how I knew that.

14        Q.   Okay.  You were informed of that by someone
15   somehow at sometime, correct?

16        A.   Yes, sir.  And I had a check for $5,000 from
17   someone for some purpose and I noted it when I
18   deposited it back in the same account that it was to
19   repay Xethanol.

20        Q.   And, therefore, you believed it was a
21   repayment of 5,000 of the 10,000 you had sent out to
22   Xethanol on February 8, 2002, correct?

23        A.   Yes, sir.

24        Q.   So the repayment came, half the repayment
25   came within a month and a half or a little less than

1    two months after you sent the money out?

2         A.    Yes, sir.

3         Q.    Did you ever receive the second $5,000

4    reimbursement check?

02:37    5         A.    No, sir.

6         Q.    Did you ever ask anyone about receiving the

7    second $5,000 reimbursement check?

8         A.    No.

9         Q.    Never asked Mr. Murphy about it?

02:37   10         A.    No.

11         Q.    Any reason why you didn't?

12         A.    You know, and I don't recall, but it seems

13    like maybe -- well, I'd be speculating.  It seems like

14    we had discussed it and that I was in for five and he

02:37   15    was in for five and we were now in for ten total

16    together.

17         Q.    But that's speculation on your behalf?

18         A.    Yes.  That would be guess -- that would be a

19    guess.  It seems like that conversation happened.  I

02:38   20    just don't recall it exactly.

21         Q.    I noticed that this check on Exhibit No. 30

22    you note -- you say it's to Costo & Rotella, P.A.  You

23    mean it came out of the Costo & Rotella trust account?

24         A.    No.  And I was confused about that at first.

25    Small ironies.  I wrote check number 5024 to Costo &

MJC REPORTING, INC.

1    Rotella, P.A. trust for $2,700.

2         Q.    Okay.

3         A.    And all you're seeing here is that the

4    deposit was noted as repay Xethanol.  And as I

02:38    5    remember I was dealing with Mr. Costo about

6    Amerishare, that was an insurance claim, and it seemed

7    like it was a workers' comp issue that W.C. Roll had

8    been involved in.  I don't recall the details.

9    Obviously the outcome of that was I wrote them a check

02:39    10   for $2,700.

11        Q.    Okay.  So the Costo & Rotella and this

12   $2,700 check had nothing to do with the $5,000 that

13   came to repay Xethanol?

14        A.    Yes.  Do you see the -- yes.  Right.  They

02:39    15   are totally unrelated.

16        Q.    Do you have any recollection sitting here

17   today what form the check came to you for repayment of

18   a portion of the Xethanol monies?

19        A.    I really don't.  I'm sorry.

02:39    20        Q.    You don't recall if it was Mr. Murphy or one

21   of his companies?

22        A.    Oh.

23        Q.    Could it have been from Casa Cielo?

24        A.    Could have been from Casa, yes, sir.  It

25   could have been.

MJC REPORTING, INC.

1       Q.    And I apologize if this question has been

2    asked before and I don't recall it, and again I don't

3    recall the answer.  For what reason did you not

4    request Mr. Murphy reimburse you the second portion of

02:39    5    the $10,000 wire funds to Xethanol?

6       A.    Well, if we were 50-50 on most of the things

7    that we were doing, then it would have been logical

8    for him to repay me half of what I put in.

9       Q.    Let's see.  You say you were 50-50 on most

02:40   10    things you were doing.

11       A.    And that relates that to Harper Place was

12    one project.  I don't know how the VSN thing broke up,

13    but we were -- I think by this time we had a

14    substantial amount of shares in that.

02:40   15       Q.    Let me ask you this question.  I thought you

16    had indicated to me earlier that your wife didn't

17    advance funds to Xethanol until April of 2002.  Did

18    I --

19       A.    VSN.

02:40   20       Q.    I mean to VSN until April of 2002.

21       A.    Yes.

22       Q.    And this is March of 2002, correct?  Or do

23    you know what the date of the deposit was?

24       A.    I don't know the exact date of the deposit.

25    It was written on the check, but you see there's a big

| | |
|---|---|
| 1 | time.  I wasn't writing many checks here, so here is a |
| 2 | 29th to the 25th.  I didn't write any checks for that |
| 3 | whole month. |
| 4 | Q.   Let me get it this way. |
02:41 | 5 | A.   I don't know what exactly -- although at |
| 6 | home there may be a deposit slip that would help us |
| 7 | with the date. |
| 8 | Q.   So you may have yet another document that |
| 9 | would give us more time -- |
02:41 | 10 | A.   I'm sorry.  I can get it up, yes. |
| 11 | Q.   Well, at our next break I'll give you that |
| 12 | opportunity. |
| 13 | A.   Sorry.  I thought it would have been on |
| 14 | here, but it isn't.  However, what was your last |
02:41 | 15 | question? |
| 16 | Q.   We've confused both you, me and the court |
| 17 | reporter so let me start all over again.  And I |
| 18 | promise I'll try not to interrupt you if you try to do |
| 19 | the same.  As of February of 2002, as of February 8, |
02:42 | 20 | 2002, the date you wired the monies to Xethanol, the |
| 21 | Murphy interest and the Roll interest were 50-50 in |
| 22 | TREP; is that correct? |
| 23 | A.   Yes. |
| 24 | Q.   The Roll interest and the Murphy interest |
| 25 | were not 50-50 in Casa Cielo at that point in time, |

1    correct?

2          A.    Correct.

3          Q.    On February 8, 2002 the Roll interest and

4    the Murphy interest were not 50-50 in VSN; is that

02:42    5    correct?

6          A.    Correct.

7          Q.    You testified earlier that your wife

8    advanced some monies to VSN.  Did you say in April of

9    2002?

02:42   10          A.    I believe it was April.

11          Q.    How do you recall that date sitting here

12    today?

13          A.    It seems like I just recall it from going

14    through stuff that we've sent or given.

02:42   15          Q.    And did you know or do you know when the

16    Murphys acquired their interest in VSN?

17          A.    No, I don't know.

18          Q.    Did you ever have a discussion with

19    Mr. Murphy at any point in time that the two of you

02:43   20    would be 50-50 on the investment in Xethanol?

21          A.    I think -- I recall a conversation where we

22    had a more general discussion.  Whether or not

23    Xethanol was specifically mentioned, I can't recall.

24          Q.    Thank you.  Do you have any knowledge as to

25    the dollar amount of monies that Mr. Murphy caused to

1       be sent to Xethanol for shares of Xethanol stock?

2              A.    Say the beginning of it again?

3              Q.    Do you have any knowledge as to the dollar

4       amount of monies sent by Mr. Murphy or Mr. Murphy's

02:44   5       interest to Xethanol in order for Mr. Murphy to

6       acquire Xethanol stock?

7              A.    I do now.

8              Q.    And you know that only as a result of

9       discovery in this case?

02:44   10             A.    I think so.

11             Q.    And how much do you understand that to be?

12             A.    I understand that on the 6th of February, a

13      $15,000 amount was sent -- or on the Xethanol books it

14      was credited to John Murphy.  And then sometime later

02:45   15      there was a -- and then the next -- and then on the

16      8th the $10,000 amount that I obviously had wired was

17      credited.  And then sometime later in May there was a,

18      the whole MLP1 loan thing happened.

19             Q.    And that was $50,000?

02:45   20             A.    And that was $50,000.

21             Q.    So as you understand it the Murphys sent

22      $50,000 plus $15,000?

23             A.    Yes.

24             Q.    Or a total of $65,000?

25             A.    Yes.

1      Q.    And you sent $10,000?

2      A.    Yes.

3      Q.    Of which you received five back from Murphy?

4      A.    Yes.

02:45    5      Q.    So the accounting as I go through that is

6    the Murphy is 70,000 and you 5,000, correct?

7      A.    Correct, as we sit here today.

8      Q.    And you never asked for further

9    reimbursement of the additional $5,000 from Casa

02:46   10    Cielo?

11      A.    No.

12      Q.    I'd like to scroll forward a bit to the

13    document we got out of your files this morning.  I'll

14    try to find out the exhibit number on that in just a

02:48   15    moment.  Exhibit No. 29.  If you could pull that out,

16    please, sir.

17      A.    Yes.

18      Q.    You heard your wife testify this morning

19    that she saw the typed version of Exhibit 29 without

02:48   20    handwritten notations on it at a meeting at which

21    Mr. Murphy, yourself and your wife attended, correct?

22      A.    I think that's what she said.

23      Q.    And do you agree with her testimony that you

24    have for the first time saw this typed portion of

25    Exhibit No. 29 at a meeting with Mr. Murphy, your wife

1    and yourself?

2         A.   Yes.

3         Q.   And where did that meeting take place?

4         A.   Mr. Murphy's office.

02:48    5    Q.   And had you asked your wife to attend that

6    meeting?

7         A.   I think that John had asked both of us to

8    come down to that meeting.

9         Q.   And as a result of Mr. Murphy's request did

02:49   10    you and your wife attend that meeting?

11        A.   Yes.

12        Q.   Do you recall the date of the meeting?

13        A.   No.  I see in the notation here of the 13th.

14        Q.   Your wife testified the meeting happened on

02:49   15    June 13, 2003.

16        A.   Yes.

17        Q.   Do you have any reason to believe that

18    that's not correct?

19        A.   I don't.

02:49   20    Q.   Your wife also testified that all the

21    handwriting on here is hers except for the two entries

22    of 100 percent.  Do you agree with that also?

23        A.   Yes.

24        Q.   Did you make the entries of 100 percent over

25    on the right-hand side about a little more than a

1    third of the way down the page?

2          A.   No.

3          Q.   Do you know who made that?

4          A.   I believe that was made by Mr. Murphy.

02:50   5          Q.   While the meeting was ongoing?

6          A.   Yes.

7          Q.   He made it during the meeting?

8          A.   I believe so.

9          Q.   He made it on the same piece of paper that

02:50   10   your wife was making her entries on?

11          A.   I believe so.  I don't think that's my

12   writing.  That is not my writing.  It looks more like

13   his writing.

14          Q.   You see the, whatever it is up at the top

02:50   15   right-hand corner?

16          A.   Mm-hmm.  Yes, sir.

17          Q.   Is that in your writing?

18          A.   This thing?

19          Q.   That symbol, whatever it is, yes.

02:50   20          A.   No.

21          Q.   It looks similar to the one in the 100

22   percent below.

23          A.   Yes, it does.

24          Q.   Do you make your ones like that ever?

25          A.   Not typically.  I have.

1        Q.    But you don't recall having done so in this
2        case?

3            A.    I don't.

4        Q.    What do you recall being discussed about the
02:50    5    Xethanol -- what -- strike that.  What do you recall
6        being discussed about Xethanol at the meeting with
7        Mr. Murphy on the date your wife believes was June 13,
8        2003?

9            A.    I think that the transfer of shares to Trust
02:51    10    No. 1 was discussed, and not acquiesced to by us.

11        Q.    Did Mr. Murphy make an oral request for that
12        in addition to it being typed on this page, Exhibit
13        No. 29?

14            A.    Yes.

02:51    15        Q.    And what did he say?

16            A.    I don't remember his exact words.

17        Q.    And do you recall whether it was you or your
18        wife who responded to those words, whatever they were?

19            A.    I -- no, I don't remember the exact
02:51    20    conversation.

21        Q.    Okay.  So you don't remember what Mr. Murphy
22        said or what you or your wife said in response to it,
23        correct?

24            A.    I don't remember the exact words.

25        Q.    Do you remember the generality of it even if

MJC REPORTING, INC.

1    you don't recall the exact words?

2         A.   Yes.

3         Q.   What was the generality of it?

4         A.   The generality of it was Mr. Murphy was

02:52   5    asking us for his Xethanol certificates back and we

6    said no.

7         Q.   How long did that discussion take place with

8    regard to the Xethanol stock issue?

9         A.   I'm sorry?

02:52   10        Q.   How long did that discussion take place

11   regarding the Xethanol stock issue?

12        A.   As it related to this whole paper?

13        Q.   No.   Just the Xethanol stock issue.

14        A.   I would imagine that was probably a very

02:52   15   short 30-second to a minute issue, if that.

16        Q.   After January 1, 2003, did you have any

17   other discussions with Mr. Murphy about Xethanol stock

18   other than the discussions you had on June 13, 2003?

19        A.   Not that I recall, no.

02:53   20        Q.   You were at Mr. Murphy's deposition in

21   Savannah two weeks ago where he testified that you and

22   your wife and he and his wife had a dinner -- no,

23   cocktails at Del Frisco's to discuss splitting the

24   Murphy and the Roll interest.  Do you recall such a

25   meeting?

1          MR. HARDY:  Object to the form.

2     Q.   You may answer.

3     A.   I recall a meeting at Del Frisco's, yes.

4     Q.   Do you recall whether that meeting was

02:53  5  before or after the meeting that you had with your

6  wife and Mr. Murphy on June 13?

7     A.   No.

8     Q.   You don't recall which it was?  It could

9  either have been before or after?

02:53 10   A.   Yes.

11    Q.   What was discussed at that meeting at Del

12  Frisco's?

13    A.   The meeting at Del Frisco's was discussing

14  how to split up the real estate development projects,

02:54 15  how to accommodate Mrs. Murphy at the Ford Plantation

16  house, and what was going to happen with VSN.

17    Q.   Was, to your recollection, the subject of

18  Xethanol stock discussed at all at that Del Frisco's

19  meeting?

02:54 20   A.   I don't think it was at all.

21    Q.   And what was decided with respect to the

22  split-up of the real estate interests and VSN?

23    A.   The Rolls would maintain Technology Real

24  Estate Partners, Murphys would get Casa Cielo, and VSN

4  25  was going to be run by John.

MJC REPORTING, INC.

1        Q.    And was it decided that your wife would give

2    up her interest in Casa Cielo Holdings?

3        A.    No.  Casa Cielo Holdings would give up its

4    ownership of Unit 4, I think.  That's the, perhaps the

02:55  5    proper way to say it, yes.

6        Q.    Okay.  The Roll family was giving up any

7    claim it had on Casa Cielo property either it directly

8    owned or it owned through your wife's LLC Casa Cielo

9    Holdings, correct?

02:55  10        A.    Yes.

11        Q.    Did it also give up its right to share in

12    the proceeds of profit splitting in Casa Cielo?

13        A.    No, I don't think -- I think that had

14    already been given up.

02:55  15        Q.    When had that been given up?

16        A.    That was given up very shortly after we got

17    into it and it was completed by 2002.

18        Q.    By the end of 2002?

19        A.    By the -- it was completed in January of

02:56  20    2002.

21        Q.    January of 2002 or January 2003?

22        A.    Sorry.  Got into Casa in October of '02.

23        Q.    Yes.

24        A.    Is that?

25        Q.    Yes, sir.

1        A.   Yes.   Sorry.   And Hope had already given up
2   her rights to sharing in any development issues going
3   forward by January of '03.

4        Q.   Do you know why Hope gave up the right to
5   share in any development profits by January of '03
6   only two and a half or three months after she entered
7   into that arrangement?

8        A.   Yes.

9        Q.   Why?

10       A.   She, you know, she testified a little
11   earlier and I maybe can get a little clearer.   A
12   couple of things happened.   One was we found out that
13   there were potentially liens and we find out that the
14   project is not as financially solvent or viable or as
15   strong as we were perhaps thinking we understood.   Let
16   me put it that way.

17            Two, I think initially at some point they
18   made -- Hope was made president of CC Residential, and
19   there was discussion or she actually signed on notes
20   at the bank and so on and so forth.   Although I have
21   not studied all those documents lately.   But it was
22   decided that she did not want any of the liability
23   that went along with the development section part of
24   it nor did she want to be on any loans.   And so she
25   just kept her unit and let the developments go back to

1       the way it was, which was I guess the Murphys.  I

2       think that's one of these documents you gave her in

3       there.

4               Q.    You said she may have signed on some of the

5       loans for Casa Cielo?

6               A.    I'm not sure.  I have not studied those.

7               Q.    Did she ever have to make good on any of the

8       Casa Cielo loans for any of the banks to your

9       knowledge?

10              A.    No.

11              Q.    Do you know whether or not those loans are

12      still outstanding that she may have acted as guarantor

13      on?

14              A.    She didn't sign -- I don't believe she

15      signed as guarantor.

16              Q.    Oh, she might have signed as the --

17              A.    She was made officer, okay, so she was

18      definitely at one point officer of CC Residential, and

19      then pretty quickly -- and that's where some of these

20      e-mails that appear to be confusing are because we got

21      into it and then we were getting out of it, she was

22      getting out of it, and I was getting out of it because

23      I had gotten into it as part of a Matthews & James,

24      whatever it was.  And so the Rolls got in, a couple

25      months later the Rolls were out, and by January we

1    were out.  So when we get to settlement in June of '03

2    then we had already basically, now we were just giving

3    up the unit.

4         Q.   After the Rolls took back the Murphys'

5    interest in TREP, what did -- as a result of the

6    settlement the Rolls wound up with all of the equity

7    interest in TREP, correct?

8         A.   Yes.

9         Q.   The Murphys transferred, either the Murphys

10   or the Murphy Trust transferred all of their equity in

11   TREP to entities controlled by the Rolls, correct?

12        A.   Correct.

13        Q.   At that time TREP had not yet completed the

14   development activity on the Harper Place project; is

15   that correct?

16        A.   Yes.

17        Q.   Was that development activity subsequently

18   completed?

19        A.   Yes.

20        Q.   On the Harper Place project?

21        A.   Oh, yes.

22        Q.   And were the units sold?

23        A.   Yes.

24        Q.   How many units did there ultimately turn out

25   to be at Harper Place?

|     |     |                                                          |
| --- | --- | -------------------------------------------------------- |
| 1   | A.  | Twenty-one.                                              |
| 2   | Q.  | Twenty-one?                                              |
| 3   | A.  | Yes.                                                     |
| 4   | Q.  | And all of them have now been sold?                      |
| 5   | A.  | Yes.                                                     |

6       Q.   And have you kept books and records on TREP
7  from which you're able to testify today as to what the
8  net result of all that was?  Did TREP make money or
9  lose money on the project?

10       A.   TREP made money on the project.

11       Q.   How much?

12       A.   I'm not exactly sure.

13       Q.   Do you have some idea what that dollar
14  amount is?

15       A.   Yes.

16       Q.   What is your idea of the dollar amount of
17  the profit --

18       A.   I believe that TREP made a million two
19  approximately.

20       Q.   And after the settlement in 2003, June of
21  2003 with the Murphys, did the Roll interest have to
22  put more capital or loans into TREP in order to help
23  it complete its development?

24       A.   Yes.

25       Q.   How much more?

03:00

MJC REPORTING, INC.

1          A.    We had to put in totally about $370,000.

2          Q.    After the settlement in June of 2003?

3          A.    Yes.

4          Q.    And as a result of putting that additional

03:01   5   money in, the final accounting resulted in an

6   approximate profit in the amount of one million two?

7          A.    I'm not an accountant.  I don't know.  I

8   don't know exactly how that all works.  TREP, if you,

9   you know -- the way I was looking at it in June 30th

03:01  10   when we settled was I got TREP.  TREP had notes to

11   Peoples for 800, got a note to First Florida for about

12   a million five, had notes to First Chatham for 2.4,

13   and I had liens of $171,000 approximately.

14          Q.    Mechanic's liens?

03:02  15          A.    Yes, sir.

16          Q.    Okay.

17          A.    And I had a six-unit building that had a

18   roof, windows and Tyvek on it, so it was framed, it

19   was Tyvek'd, it was flapping in the breeze and it was

03:02  20   far from finished.

21          Q.    And in addition to those obligations you've

22   just set forth -- and let me make sure I got them

23   right.  There were mechanic's liens of 171,000 as of

24   June of 2003?

25          A.    Yes.

| | | |
|---|---|---|
| 1 | Q. | First Chatham was owed two million four? |
| 2 | A. | That was for the Ford houses. |
| 3 | Q. | Yes.  And the memberships at the club? |
| 4 | A. | Yes. |
| 03:02 5 | Q. | And Peoples was owed 700,000? |
| 6 | A. | Peoples was between seven and 800. |
| 7 | Q. | And First Florida was a million two? |
| 8 | A. | I believe it was a million five, actually. |
| 9 | Q. | A million five? |
| 03:03 10 | A. | Those numbers I'm not 100 percent.  We could |

11   figure it out.

12        Q.   And in addition to that the Roll family
13   interest put in another 300,000; is that correct?
14        A.   I think we put in actually more than that.
03:03 15        Q.   How much more than that?
16        A.   I think we -- I think to get the liens we
17   paid -- obviously we paid 171 to get the liens cleared
18   up so we could start construction.
19        Q.   That then took the liens off?
03:03 20        A.   That took the liens off, and now I'm still
21   sitting there with nothing and I know that the initial
22   contribution that we made was 271.  So 171 to liens
23   and then 100 to start, and then I know I put at least
24   111 in.  After that, I haven't done the math.
25        Q.   So 271 and 171 --

1           A.    For this purpose.

2           Q.    -- is 442, and you put in another 100 at

3     least.  That's 542,000?

4           A.    Well, let me do it another way.  I know we

03:04    5     put in 271, and then I put in another 111, and there

6     may be more after that.  Those are the two big --

7           Q.    That's 388.  Did you pay off the liens out

8     of that 388?

9           A.    Yes.  Yes.  Yes.

03:04   10           Q.    And after all the units were sold -- let me

11     deal with the Georgia property first.  The two houses

12     in Georgia, were they sold?

13           A.    No.

14           Q.    One of the houses was sold?

03:04   15           A.    Yes.

16           Q.    The house that was designated as the Murphy

17     family house was sold?

18           A.    Yes.

19           Q.    Did it realize enough to pay off the

03:04   20     mortgage?

21           A.    Yes.

22           Q.    Was there any profit out of it?

23           A.    No.

24           Q.    Did it realize enough to pay off the Murphy

25     family club membership?

1          A.    No.   No.   See, that's where it's confusing.

2     The new person that buys it pays for the membership

3     and the membership then just gets reimbursed back and

4     it went in this case to the bank.

03:05    5          Q.    Okay.  But you didn't have to pay any

6     money -- TREP didn't have to pay any money to the bank

7     for the membership or that house?

8          A.    At closing to the new guy.  I don't believe

9     we did.

03:05   10          Q.    Okay.  Fine.  And what happened to the other

11     house that was designated as the Roll family house?

12     Did you keep it?

13          A.    Yes.  The Rolls have kept it.

14          Q.    And have you tried to sell it?

03:05   15          A.    No, not recently.  The market was saturated

16     up there.  We decided to hold off.

17          Q.    And so you still have that.  And do you use

18     it from time to time?

19          A.    We do.

03:05   20          Q.    Try to rent it out?

21          A.    We do.

22          Q.    The loan to Peoples was repaid?

23          A.    The loan to Peoples was ultimately purchased

24     by a personal individual.

25          Q.    Would that be Charles Clayton, Junior?

1       A.   Yes.

2       Q.   Was he subsequently repaid for that loan?

3       A.   Yes.

4       Q.   And how about First Florida?  Was it repaid?

03:06  5       A.   Yes.

6       Q.   And then the 388,000, the Rolls had to put

7  into the property additionally, was that paid back?

8       A.   Yes.

9       Q.   And on top of that there was a profit?

03:06  10      A.   On top of all that there was a profit.

11      Q.   Of about a million two?

12      A.   Yes.  A guess.  Thanks to a wonderful

13  market.

14      Q.   Rising tide raises all boats?

03:06  15      A.   It did.  In this case it was a blessing.

16      Q.   Timing is everything, right?

17      A.   Yes.

18      Q.   Rather be lucky than good, right?

19      A.   Yes.  I consider it blessed.

03:06  20           MR. LINSCOTT:  I would like to have you

21           take another break and see if you can call

22           your spouse and see if you can find a

23           deposit slip.

24           THE WITNESS:  Certainly.

25           THE VIDEOGRAPHER:  Okay.  We're off the

|     |     |
| --- | --- |
| 1 | record. The time now is 4:45 p.m. |
| 2 | (Recess). |
| 3 | THE VIDEOGRAPHER: Okay. We're on the |
| 4 | record. Time now is 5:08 p.m. |
| 5 | (Document marked for identification |
| 6 | Defendant's Exhibit No. 31). |
| 7 | BY MR. LINSCOTT: |
| 8 | Q. Mr. Roll, I've handed you what has been |
| 9 | marked for identification as Exhibit No. 31. |
| 10 | A. Yes, sir. |
| 11 | Q. And on Exhibit No. 31 there appear to be |
| 12 | three deposit receipts. The last of them appears to |
| 13 | be a deposit receipt for $5,000; is that correct? |
| 14 | A. That is correct. |
| 15 | Q. Is that the dollar amount of the receipt |
| 16 | that you got for a partial repayment of the 10,000 you |
| 17 | had sent to Xethanol at Mr. Murphy's request back on |
| 18 | February 8? |
| 19 | A. Yes, it appears that it's registered on that |
| 20 | same check. |
| 21 | Q. And it appears as though that is a deposit, |
| 22 | the $5,000 deposit made into your account on behalf of |
| 23 | W.C. Roll Construction company on April 2nd of '02. |
| 24 | Do you agree with that? |
| 25 | A. Yes, I would. |

03:30 (line 10)
03:30 (line 15)
03:30 (line 20)

1          Q.    I think based upon some testimony you gave

2     earlier you don't know who paid that $5,000 to you; is

3     that correct?

4          A.    Correct.

03:30    5          Q.    But you were made aware by someone somehow

6     that that $5,000 represented a return of 5,000 of the

7     10,000 you had sent off to Xethanol; is that correct?

8          A.    That's correct.

9          Q.    And you believe that to be in fact a refund

03:31   10     of half of that money, correct?

11          A.    Yes.

12                MR. HARDY:  And it also matches the

13                stub on the other.

14                MR. LINSCOTT:  For the check.  Yes.

03:31   15     Fine.  That's overkill but I understand.

16                I have no further questions.

17                MR. HARDY:  We have no questions.  We

18                would like to read.

19                MR. LINSCOTT:  Thank you.

03:31   20                THE VIDEOGRAPHER:  This is the end of

21                deposition.  The time now is 5:10 p.m., and

22                we're off the record.

23                      *     *     *     *     *

24

25

MJC REPORTING, INC.

1            E R R A T A   S H E E T

2

     DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
3
     IN RE:  Roll vs. Xethanol
4
     DEPOSITION OF WILLIAM C. ROLL taken 9/18/06
5

6    Page      Line     Correction          Reason

7

8

9

10

11

12

13

14

15

16

17   Under penalties of perjury, I declare that I have read
     my deposition and that it is true and correct subject
18   to any changes in form or substance entered here.

19

20

21   _____        _____
       DATE                           WILLIAM C. ROLL
22

23   (Note:  This document not longer needs to be
     notarized).

24

25

1    **CERTIFICATE OF OATH**

2

3    STATE OF FLORIDA    )

4    COUNTY OF ORANGE    )

5

6

7         I, PAMELA S. HARDY, FPR, RMR, CRR, Notary Public,

8    State of Florida, certify that WILLIAM C. ROLL personally

9    appeared before this 18 day of September, 2006, and was

10   duly sworn.

11

12

13

14   *Pamela S Hardy*

15   **PAMELA S. HARDY, FPR, RMR, CRR**

16   Notary Public, State of Florida

17   DD 281072

18   My commission expires April 17, 2008

19

20              *    *    *    *    *

21

22

23

24

25

MJC REPORTING, INC.

1                    **CERTIFICATE OF REPORTER**

2

3

4       STATE OF FLORIDA      )

5       COUNTY OF ORANGE      )

6

7              I, PAMELA S. HARDY, Registered Merit Reporter and

8       Certified Realtime Reporter, do hereby certify that I was

9       authorized to and did stenographically report the foregoing

10      deposition of WILLIAM C. ROLL; that a review of the

11      transcript was requested; and that the foregoing

12      transcript, pages 1 through 124 is a true record my

13      stenographic notes.

14             I FURTHER CERTIFY that I am not a relative, employee,

15      or attorney, or counsel of any of the parties, nor am I a

16      relative or employee of any of the parties' attorney or

17      counsel connected with the action, nor am I financially

18      interested in the action.

19

20             Dated this 22 day of September 2006, at Orlando,

21      Orange County, Florida.

22

23

24      _____

25      **PAMELA S. HARDY, FPR, RMR, CRR**


**MJC REPORTING, INC.**



DEFENDANT'S
EXHIBIT
30
W. Roll 9-18-06

5024
DATE 3/29/02
TO Kristo Rotella Da Trust
Replay X Nathonal        $15000
FOR
Amerisure          TOTAL    16993 06
                   THIS CHECK    2700
                   OTHER TRANS.
TAX DEDUCTIBLE ☐   BALANCE    14293 06
            4-19 A6 L

5025
DATE 4.25.02
TO Gonzalez

FOR
                   TOTAL
                   THIS CHECK    65 79
                   OTHER TRANS.
TAX DEDUCTIBLE ☐   BALANCE    14227 27
            A6 L
            4.31.02

5026
DATE 4.25.02
TO Dept of State
FOR C&R LAND
2002 Vin Boska
VBR              THIS CHECK    150
                   OTHER TRANS.
TAX DEDUCTIBLE ☐   BALANCE    14077 27

BAL. BROT. FORD    11993 06
DEPOSITS

**DEFENDANT'S EXHIBIT**
31
W. Roll 9-18-06



**DEPOSIT RECEIPT**
This is a Receipt For Your Deposit

BANK OF CENTRAL FLORIDA
"One friend tells another"
MEMBER FDIC

MAIN OFFICE
1401 Lee Road
Orlando, FL 32810
407-298-6600

SOUTH BRANCH
5292 S. Orange Blsm. Tr
Orlando, FL 32839
407-859-6600

APOPKA BRANCH
211 S. Edgewood Avenue
Apopka, FL 32703
407-886-1400

MAITLAND BRANCH
100 S. Orlando Avenue
Maitland, FL 32751
407-644-6604

DOWNTOWN BRANCH
105 E. Robinson St.
Orlando, FL 32801
407-422-0707

OVIEDO BRANCH
1753 W. Broadway St.
Oviedo, FL 32765
407-365-9667

DEPOSIT R
DEPOSIT ENT ON CHECK ST
NO. 500
NUMBER OF DEPOSITED
Deposits May Not Be Available For Immediate Withdrawal.
All items subject to verification, collection and conditions noted on signature card.
DEPOSIT MEMO:

187 123 3/5/02 111051210 DP$21,288.27

---

**DEPOSIT RECEIPT**
This is a Receipt For Your Deposit



DEPOSIT REC
DEPOSIT ENTERI ON CHECK STUB
NO. 5019
NUMBER OF CHE DEPOSITED
DEPOSIT MEMO:

101 61 3/26/02 111051210 DP$22,650.00

---

**DEPOSIT RECEIPT**
This is a Receipt For Your Deposit

DEPOSIT REC
DEPOSIT ENTER ON CHECK STUB
NO. 4074
NUMBER OF CH DEPOSITED
DEPOSIT MEMO:

186 12 4/2/02 111051210 DP$5,800.00